A-570-900
Remand:  AR 11/1/14-10/31/15
Court No. 17-00167,
Appeal No. 20-1478
**Public Document**
E&C/OI:  TES

**FINAL REMAND REDETERMINATION**
**Diamond Sawblades Manufacturers' Coalition v. United States**
**Court No. 17-00167, Appeal No. 20-1478**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of remand redetermination in accordance with the March 25, 2021 order of the United States Court of International Trade (CIT or Court) in *Diamond Sawblades Manufacturers' Coalition v. United States*, Court No. 17-00167 (CIT March. 25, 2021) (*Remand Order*).  The litigation involves challenges to our *Final Redetermination*[1] in the administrative review of the antidumping duty order on diamond sawblades and parts thereof (diamond sawblades) from the People's Republic of China (China) covering the period of review November 1, 2014, through October 31, 2015.

In its *Remand Order*, the CIT remanded the *Final Results*[2] to Commerce for further proceedings in conformity with the opinion of the Court of Appeals for the Federal Circuit (CAFC) in *Diamond Sawblades Mfrs. Coal. v. United States*, 986 F.3d 1351 (CAFC 2021) (*DSBs*), wherein the CAFC stated a remand is appropriate to determine if "there is no basis for Commerce to disregard under {section 776(a) of the Tariff Act of 1930, as amended (the Act)} the {Bosun Tools Co., Ltd. (Bosun)}-supplied origin information for the sales to unaffiliated U.S. customers during the period of review outside the category of sales analyzed via the {first-

---

[1] *See Final Remand Redetermination, Diamond Sawblades Manufacturers' Coalition v. United States*, Court No. 17-00167, Slip Op. 18-146, dated April 17, 2019 (*First Redetermination*).
[2] *See Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 26912 (June 12, 2017) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

in-first-out} methodology," and if there is no basis to do so, stated that "a redetermination of how {section 776(b) of the Act} applies to this matter will be needed."[3]

As discussed in detail below, for these final results of redetermination, Commerce recalculated Bosun's dumping margin with an adverse inference in selecting from among the facts otherwise available on the record (AFA) only to those sales for which Bosun assigned the country of origin using its first-in-first-out (FIFO) methodology.  For the eligible non-selected respondents, we applied the rate recalculated for Bosun.[4]

## II.    BACKGROUND

Bosun Tools, Inc. (Bosun USA) and Pioneer Tools, Inc. (Pioneer USA) are Bosun's U.S. sales affiliates.  Bosun USA and Pioneer USA sold to their U.S. customers diamond sawblades exported from China by Bosun and diamond sawblades exported from Thailand by Bosun Tools (Thailand) Co., Ltd. (Bosun Thailand).  However, Bosun USA and Pioneer USA did not maintain a record of the country of origin of diamond sawblades exported from China by Bosun and diamond sawblades exported from Thailand by Bosun Thailand and sold in the United States to unaffiliated U.S. customers.  Instead, Bosun identified the country of origin using an alternative sales identification methodology, based on:  (1) the particular product code (which was country-specific for some products); (2) the unit price (which allowed origin identification for some products); and (3), for remaining products, a FIFO methodology.  Prior to issuing the *Final Results*, we verified this methodology and, at the time, found it acceptable.[5]  The Diamond Sawblades Manufacturers' Coalition (the petitioner) requested that we assign a rate based on AFA to Bosun for its failure to maintain a record of the country of origin.  While Bosun did not

---

[3] *See DSBs*, 986 F.3d at 1367.
[4] *See Final Results* IDM Comment 1.
[5] *See* Memorandum, "Diamond Sawblades and Parts Thereof from the People's Republic of China:  Verification of the U.S. Sales Response of Bosun Tools Co., Ltd.," dated May 17, 2017 (Bosun Verification Report).

maintain a record of the country of origin as would be our preference, we found at the time that Bosun acted to the best of its ability by providing the alternative sales identification methodology.  We verified and accepted Bosun's alternative sales identification methodology and calculated a margin for Bosun.[6]

The CIT remanded the *Final Results* to Commerce in order to further clarify or reconsider Commerce's conclusion that Bosun acted to the best of its ability in responding to Commerce's requests for information.[7]  In the *First Redetermination*, we concluded that "Bosun failed to cooperate to the best of its ability and applied an AFA rate to Bosun, *i.e.*, 82.05 percent."[8]  In *DSBs*, however, the CAFC stated that there appears to be no basis for Commerce to disregard the Bosun-supplied origin information for the sales to unaffiliated U.S. customers during the POR for which Bosun did not assign the country of origin using its FIFO methodology, and therefore, the CAFC remanded the *First Redetermination* for further proceedings.[9]

On May 12, 2021, we released the Draft Results to interested parties for comment.[10]  On June 1, 2021, we received comments from the petitioner[11] and Bosun.[12]

---

[6] *See Final Results* IDM at Comment 3.
[7] *See Diamond Sawblades Manufacturers' Coalition v. United States*, Court No. 17-00167, Slip Op. 18-146 (CIT October 23, 2018) (*First Remand Order*).
[8] *See First Redetermination* at 22.
[9] *See DSBs*, 986 F.3d at 1367.
[10] *See* Draft Results of Remand Redetermination, *Diamond Sawblades Manufacturers' Coalition v. United States*, Consolidated Court No. 17-00167, Appeal No. 20-1478, dated May 17, 2021 (Draft Results).
[11] *See* Petitioner's Letter, "Diamond Sawblades and Parts Thereof from the People's Republic of China:  Comments on Draft Results of Redetermination," dated June 1, 2021 (Petitioner's Comments).
[12] *See* Bosun's Letter, "Diamond Sawblades from the People's Republic of China – Comments on Second Remand Results," dated June 1, 2021 (Bosun's Comments).

## III.    DISCUSSION

<u>Bosun</u>

The CIT remanded the *First Redetermination* for further proceedings in conformity with the CAFC's opinion in *DSBs*.[13]  The CAFC stated that a remand is advisable for the parties to address the issue of whether "there is a supported basis for finding the Bosun-supplied information unreliable outside the category of sales for which origin was identified using only the FIFO-inference step (rather than the two earlier steps)."[14]  Upon further consideration of the record evidence, and in light of the CAFC's holdings, we analyzed Bosun's country-of-origin information for sales identified using all three steps in the identification methodology described above.  We find no reliability concerns regarding Bosun's country-of-origin information for sales identified using either of the first two steps in the identification methodology described above.  Therefore, we no longer find a basis for disregarding the country-of-origin information for such sales.  In light of our finding that the data identifying the country-of-origin of the sales identified using either of the first two steps in the identification methodology described above (the "non-FIFO sales") are reliable, we are not selecting from among facts otherwise available (*i.e.*, we are finding that section 776 of the Act does not apply to non-FIFO sales), and we are relying on Bosun's reported information for these sales and calculating a dumping margin based on this information.[15]

With respect to the sales identified using the FIFO step, in accordance with the CAFC's holding that "the evidence supports a finding that the information submitted could not be verified

---

[13] *See Remand Order*.
[14] *See DSBs*, 986 F.3d at 1367.
[15] *See* Memorandum, "Diamond Sawblades and Parts Thereof from the People's Republic of China:  Draft Remand Results Calculation Memorandum for Bosun Tools Co., Ltd.," dated concurrently with this draft redetermination (Bosun Draft Calculation Memorandum).

and that, as a result, origin information about those sales was missing," we continue to find that resorting to selecting from among the facts otherwise available to replace the missing or not reliably reported necessary information is appropriate for those sales, pursuant to sections 776(a)(1) and (a)(2)(D) of the Act.

The CAFC also stated that, if there is no basis to disregard the origin information for the non-FIFO sales, "a redetermination of how {section 776(b) of the Act} applies to this matter will be needed."[16]  Consistent with our finding above that there is no basis on which to disregard the country-of-origin information for the non-FIFO sales, we explain here how section 776(b) of the Act applies to this matter.[17]

We continue to find, pursuant to section 776(b) of the Act, that an adverse inference is warranted in our selection from among the facts otherwise available on the record with respect to the sales identified using the FIFO step.  Specifically, we continue to find that Bosun failed to maintain full and complete records regarding country of origin, despite its apparent ability to do so, and despite its familiarity with Commerce proceedings and awareness of the need for distinguishing the country of origin of its merchandise for export.  Accordingly, we find that Bosun failed to cooperate to the best of its ability in responding to Commerce's requests for information within the meaning of section 776(b) of the Act, and that because of this failure, Bosun was unable to reliably identify the country of origin for the FIFO-identified sales. Accordingly, for these final results of redetermination, we have used an adverse inference when

---

[16] *See DSBs*, 986 F.3d at 1367.
[17] Notably, *DSBs* states that "{n}either Commerce nor the {CIT} misinterpreted our holdings in Nippon Steel or Peer Bearing regarding the 'best of its ability' standard of {section 776(b) of the Act}." *See DSBs*, 986 F.3d at 1367.  *DSBs* explains, however, that a prerequisite for using an adverse inference is a proper finding by Commerce to use facts otherwise available under section 776(a) of the Act prior to applying an adverse inference.  Here, as explained above, we have determined that resorting to selecting from among the facts otherwise available is warranted because necessary information is missing from the record, or was provided but could not be verified, in accordance with sections 776(a)(1) and (2)(D) of the Act, only with respect to the sales identified using the FIFO step. This is consistent with *DSBs* and with the Act.

selecting from among the facts otherwise available to incorporate into our margin calculation the data pertaining to "the category of sales for which origin was identified using only the FIFO-inference step" consistent with the CAFC's decision in *DSB*s.[18]

The U.S. sales database reported by Bosun provided no means for us to ascertain which of its sales were determined to be of Chinese origin based on the FIFO methodology or another methodology.  Moreover, the Bosun Verification Report did not contain the information needed to identify such sales in Bosun's U.S. sales database.  Therefore, in order to comply with the CAFC's decision, we sent a supplemental questionnaire to Bosun requesting that Bosun identify which of the sales it reported in its U.S. sales database were determined to be of Chinese origin using its FIFO methodology.[19]  Bosun submitted its response on April 19, 2021.[20]

Using the information Bosun submitted, we determined the FIFO-identified sales which Bosun reported in its U.S. sales database by sequence number and applied the AFA rate of 82.05 percent to all such sales.[21]  Because not all of Bosun's FIFO-identified sales were reported in its U.S. sales database (*i.e.*, Bosun determined that they were Thai-origin product using its FIFO methodology), we also applied the AFA rate for the FIFO-identified sales in the U.S. sales database as a per-unit amount and applied that per-unit amount to the quantity of FIFO-identified sales which Bosun did not report in its U.S. sales database (*i.e.*, the difference in quantity between the total quantity of FIFO-identified sales indicated in the Bosun Verification Report and the total quantity of FIFO-identified sales which Bosun reported in its U.S. sales database).

---

[18] *Id*.

[19] *See* Commerce's Letter, dated April 12, 2021 (Bosun SQ).

[20] *See* Bosun's Letter, "Diamond Sawblades from the People's Republic of China – Remand Supplemental Questionnaire," dated April 19, 2021 (Bosun SQR).

[21] Although Bosun apparently claims that less than 2.5 percent of the total volume of sales is affected by its FIFO-identified methodology (*see*, *e.g*., *DSB*s, 986 F.3d at 1360, 1364-65), the record does not support this claim.  A comparison of the "quantities of sales segregated using the FIFO methodology" in the Bosun Verification Report at 11 and the total quantity of U.S. sales indicated on page 360 of the program output attached to the Bosun Draft Calculation Memorandum shows that the 2.5 percent figure claimed by Bosun is not accurate.

Finally, we combined the AFA-determined margin for FIFO-identified sales which Bosun reported in its U.S. sales database, the AFA-determined margin for FIFO-identified sales which Bosun did not report in its U.S. sales database, and the calculated margins for non-FIFO sales for purposes of calculating the weighted-average cash-deposit and importer-specific assessment rates.[22]  Using this methodology, we have determined a margin of 29.31 percent for Bosun.

Non-Selected Separate Rate Respondents

Section 735(c)(5)(A) of the Act provides that Commerce shall calculate the all-others rate equal to the weighted average of the margins calculated for the individually examined respondents, excluding margins that are zero, *de minimis*, or based entirely on facts available.  In this administrative review, the only margin that is not zero, *de minimis*, or based entirely on facts available is the recalculated margin for Bosun.  Therefore, in accordance with section 735(c)(5)(A) of the Act, we assigned the recalculated margin for Bosun to the non-selected respondents eligible for a separate rate.

## IV.    COMMENTS ON DRAFT RESULTS OF REDETERMINATION

Comment 1:  What Surrogate Value Should Be Used for Copper Powder and Copper Iron Clab

*Petitioner's Comments*

- Commerce should value Bosun's copper powder and copper iron clab input using South African import statistics.[23]

  o  Although Commerce found in the *Final Results* that the petitioner had not substantiated its claim that the Thai average unit value (AUV) was aberrational, the

---

[22] *See* Bosun Draft Calculation Memorandum.
[23] *See* Petitioner's Comments at 6-10.

CIT ruled in the *First Remand Order* that Commerce did not adequately address the petitioner's argument that the Thai AUV is an outlier.[24]

o The CIT's ruling was mooted because Commerce based Bosun's margin entirely upon AFA for the *First Redetermination*.[25]

o Now that Commerce is no longer basing Bosun's margin entirely upon AFA, Commerce must reconsider its valuation of copper powder and copper iron clab using Thai import statistics.[26]

- The Thai AUV, which Commerce used in the *Final Results*, is aberrationally low.[27]

o While all data sets will necessarily have a highest and lowest value, the next lowest AUV is almost four times greater than the Thai AUV; the Thai AUV is also eight times lower than the average of the prices from the economically comparable countries (excluding the Thai data point and what appears to be an outlier from Ecuador).[28]

o The record indicates that the South African AUV is preferable, because it is well within the range calculated for other countries economically comparable to China, as well as the U.S. AUV.[29]

o In the *Final Results*, Commerce cited two cases in which it either considered historical data or remarked on a lack of historical data in rejecting arguments that a value was aberrational, but neither of those cases justifies a finding that only

---

[24] *Id.* at 7.
[25] *Id.* at 7-8.
[26] *Id.* at 8.
[27] *Id.* at 8-10.
[28] *Id.* at 8.
[29] *Id.*

historical data permit an evaluation of whether a proposed surrogate value is aberrational.[30]

o   Commerce has analyzed contemporaneous AUVs in other cases to determine whether a particular surrogate value is aberrational, without requiring historical data, or using the lack of historical data as a rationale for finding data non-aberrational.[31]

o   This is not a case where Commerce has only two data points to compare, and thus has no means for determining whether either is aberrational; rather, Commerce has the AUVs from all six of the countries deemed economically comparable to China, plus the United States.[32]

**Commerce's Position**:  For the *Final Results*, we valued copper powder and copper iron clab inputs using Thai import data for HTS subheading 7406.10, covering copper powders of non-lamellar structure.[33]  The petitioner argued that the Thai value was aberrational and provided import statistics for the other countries identified on Commerce's surrogate country list to show that the Thai value was the lowest of those values.[34]  For the *Final Results*, we found that the petitioner had not sufficiently demonstrated that the value was aberrational.[35]  We explained that a value being the lowest does not necessarily make it aberrational and that we have a preference for valuing all surrogate values within the same surrogate country, when possible.[36]

---

[30] *Id*. at 8-9.
[31] *Id*. at 9-10.
[32] *Id*. at 10.
[33] *See* IDM at 47-48.
[34] *See* DSMC's Letter, "DSMC's Rebuttal Surrogate Value Comments," dated May 31, 2016 (DSMC Rebuttal SV Comments) at Exhibit 1C.
[35] *See* IDM at 47-48.
[36] *Id.* at 48.

The CIT remanded the issue, holding that we did not address the petitioner's argument or the petitioner's analysis showing the Thai value as lower than the other values on the record.[37] We did not previously address this issue on remand, because we applied total AFA to Bosun.[38] Although the CAFC issued its opinion stating that remand was appropriate to address the "focused issue" of our application of AFA,[39] we address the petitioner's arguments because we are now using the copper surrogate value in this remand redetermination.

We continue to find that the petitioner has not demonstrated that the Thai AUV used to value copper powder and copper iron clab is aberrational.  As we explained in the *Final Results*, "{a} mere appearance of an AUV on the high or low end of a range of AUVs is not generally sufficient to determine that an AUV at one end is aberrational."[40]  Moreover, the petitioner did not provide historical data to analyze whether the value is aberrational in comparison to historical prices.[41]  Nevertheless, we address the petitioner's argument that the Thai value is aberrational because it is lower than the other values provided by the petitioner.

As an initial matter, the chart provided by the petitioner showing the Thai AUV as 1.32 USD/kg appears to be incorrect.[42]  The petitioner appears to have incorrectly summed the Thai import data when determining this value.[43]  The correct value, and the one used by Commerce in

---

[37] *See First Remand Order* at 24 ("{G}iven that Commerce did not directly address the substance of the DSMC's argument, the standard of review of substantial evidence compels remand in this instance . . . .").
[38] *See First Redetermination* at 13.
[39] *DSBs*, 986 F.3d at 1367.
[40] IDM at 48 (citing *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 61172 (October 9, 2015), and accompanying Issues and Decision Memorandum at Comment 10 and *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 23272 (April 20, 2016), and accompanying Issues and Decision Memorandum at Comment 10).
[41] *Id.*
[42] *See First Remand Order* at 19; DSMC Rebuttal SV Comments at Exhibit 1C.
[43] *See* DSMC Rebuttal SV Comments at Exhibit 1C.  The chart entitled "Thailand Import Statistics" states that the "Grand Total" for value is 6,522,280 Baht but summing the values for the countries listed results in 245,710,385 Baht.  The chart lists the "Grand Total" for quantity as 146,336 kg but summing the quantities for the countries listed results in 4,312,367 kg.

this final remand redetermination, is 56.98 Baht/kg, or 1.74 USD/kg.[44]  Moreover, the "Grand Total" sum in the chart submitted by the petitioner significantly understates the volume of imports for Thailand.[45]  Accordingly, although the petitioner argues that the next lowest AUV is almost four times greater than the Thai AUV, it is actually less than three times greater, and we find that it is consistent with a finding that the Thai AUV is not aberrational, but simply the lowest value on a continuum of prices.

Finally, we note that the Thai data reflect imports from a broader range of countries and are based on a significantly larger import quantity than the data the petitioner provided for the other countries.[46]  Therefore, we find that the Thai AUV is not an outlier, and we continue to find that the petitioner has not established that the value is aberrational.  Accordingly, combined with our preference for valuing all surrogate values in a single surrogate country, we continue to use the Thai surrogate value for copper powder and copper iron clab for these remand results.

Comment 2:  Whether Commerce Should Correct an Alleged Ministerial Error

*Bosun's Comments*

- Commerce should correct the ministerial error in identifying the reported-FIFO sales and non-reported FIFO sales.[47]

  o The field "SN reported in Sale database" Bosun reported is not the sequence number (SEQU) reported in the U.S. sales file; it represents a unique internal number that Pioneer USA assigned to sales observations.[48]

---

[44] *See* Memorandum, "Draft Remand Results Calculation Memorandum for Bosun Tools Co., Ltd.," dated May 17, 2021 (showing that the margin programming used 1.74245 for COPPERPDRSV_USD and 56.9781 for COPPERPDRSV).
[45] DSMC Rebuttal SV Comments at Exhibit 1C (listing the "Grand Total" for quantity as 146,336 kg but summing the quantities for the countries listed results in 4,312,367 kg).
[46] *See* DSMC Rebuttal SV Comments at Exhibit 1C.
[47] *See* Bosun's Comments at 5-8.
[48] *Id*. at 6.

- o There is no relationship between the serial number reported in Exhibit SQ-2 and the SEQU numbers reported in the U.S. sales file.[49]

- o Thus, the serial number cannot be used to match or link the transactions listed in Exhibit SQ-2 with the U.S. sales file.[50]

- o The error can be easily corrected by concatenating the invoice number and product code in both the SQ-2 file and the U.S. sales file to create and use a unique key to identify reported US sales identified by the FIFO method.[51]

**Commerce's Position**:  We agree with Bosun that there was an error in our calculations as a result of misidentifying Bosun's reported serial numbers as sequence numbers.[52]  Specifically, we asked Bosun to "identify the sequence numbers in the U.S. sales database you submitted with your supplemental response dated November 10, 2016, corresponding to Pioneer Tools, Inc.'s FIFO… transactions."[53]  Bosun submitted an excel spreadsheet with a field entitled "SN reported in Sale database."[54]  Because our instructions asked for sequence numbers, we concluded that "SN" referred to the sequence number; nowhere in Bosun's supplemental response does the word "serial" appear.  However, based on Bosun's comments on the Draft Results and upon re-examination of the data resulting from the program, we agree that we made the error described by Bosun.[55]  In order to correct this error, we have used the language Bosun provided in its comments on the Draft Results.[56]

---

[49] *Id*.
[50] *Id*.
[51] *Id*. at 7.
[52] We note that, although Bosun alleges this was a "ministerial error," Commerce issued its calculations as part of a draft remand redetermination.  Therefore, because we have the authority to correct this error for the final remand redetermination regardless of whether we consider it to be ministerial, we have not analyzed whether the error is a "ministerial error" as provided in section 735(e) of the Act and 19 CFR 351.224.
[53] *See* Bosun SQ at 1.
[54] *See* Bosun SQR at Exhibit SQ-2.
[55] *See* Bosun's Comments at 6-7 and Exhibit 1.
[56] *Id*. at Exhibit 2.

<u>Comment 3:  Whether Commerce Should Eliminate Intracompany Sales from Its Calculations</u>

*Bosun's Comments*

- Commerce should eliminate intracompany sales from its calculations.[57]

  o The quantity of the total FIFO-identified sales indicated in the verification report includes intracompany sales.[58]

  o As a result, the quantity of FIFO-identified sales which Bosun did not report in its U.S. sales database includes intracompany sales.[59]

  o These were not sales of the companies to unaffiliated downstream U.S. customers and, thus, there is no basis at all to include them as Bosun's U.S. sales or apply any adverse inference pertaining to these sales.[60]

  o Commerce should accept and deduct these intracompany sales, or, in the alternative, issue a supplemental questionnaire and request Bosun to identify the number of pieces contained within these transactions so that Commerce can deduct them from the calculations associated with the FIFO sales not reported in the U.S. sales database.[61]

**Commerce's Position**:  We have not removed Bosun's claimed intracompany sales for these final results of redetermination.  In its *Remand Order*, the CIT remanded the *Final Results* to Commerce for further proceedings in conformity with the opinion of the CAFC in *DSBs*, wherein the CAFC concluded that, while "some of the bases on which Commerce invoked {section 776(a) of the Act} are unsupported by substantial evidence," others, "which involve

---

[57] *See* Bosun's Comments at 8-9.
[58] *Id*. at 8.
[59] *Id*.
[60] *Id*.
[61] *Id*. at 9.

only a gap in reliable information—are adequately supported" and that "{i}t appears that the errors Commerce identified in Bosun's information are limited in their reliability-undermining effect to a defined subset of sold sawblades (the subset of sawblades whose origin Bosun identified only through the FIFO-inference step)."[62]  The CAFC held that Commerce's application of facts available pursuant to section 776(a)(1) and (a)(2)(D) of the Act to Bosun's FIFO sales was supported by substantial evidence.[63]  Moreover, the CAFC stated that "{n}either Commerce nor the Trade Court misinterpreted our holdings in *Nippon Steel* or *Peer Bearing* regarding the "best of its ability" standard of {section 776(b) of the Act}."[64]  The CIT cited *Nippon Steel* and *Peer Bearing* in explaining that "the 'best of its ability' standard 'requires the respondent to do the maximum it is able to do, ' inclusive of 'maintaining full and complete records' of relevant data."[65]  Notably, the CIT explained that finding that Bosun met the "best of its ability" standard "would appear to be at odds with appellate precedent on the meaning of 'best of its ability' standard and the facts on the record at bar{.}"[66]  Therefore, the CAFC's opinion supports our finding that the FIFO methodology is unreliable for determining country of origin and that Bosun's failure to maintain country-of-origin information is inconsistent with acting to the best of its ability.  Accordingly, although we are no longer applying AFA to the non-FIFO-identified sawblades, we continue to find that AFA is appropriate with respect to all sales of sawblades identified using the unreliable FIFO methodology.

---

[62] *See DSBs*, 986 F.3d at 1355.

[63] *See DSBs*, 986 F.3d at 1364 ("During verification Commerce found problems in several of Bosun's origin identifications; and putting to one side the important question of how much of Bosun's overall origin information those problems render unreliable, we think it clear that Commerce could reasonably find the problems sufficient to deem unreliable at least a portion of Bosun's information,  *i.e.*, the portion resorting to the FIFO step for identifying the origin of particular U.S. sales.").

[64] *See id.* at 1367.

[65] *See First Remand Order* at 10 (citing *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1400 (Fed. Cir. 2014) (*Peer Bearing*); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (*Nippon Steel*)).

[66] *Id.* at 9.

We further observe that the verification report, where the FIFO methodology was examined and the reliability issues identified, makes no mention of intracompany sales as being part of Bosun's FIFO methodology.  Now, for the first time on the record of these proceedings, Bosun explains that it used the FIFO identification step on intracompany sales.  Because Bosun did not indicate that its FIFO step was applied to intracompany sales in any of its supplemental responses explaining its country-of-origin identification methodology, or indeed anywhere on the record prior to its comments in this remand proceeding, Commerce was unable to verify this information or otherwise analyze these claims.[67]  Additionally, consistent with the CAFC's opinion, on remand, we are examining whether "there is a supported basis for finding the Bosun-supplied information unreliable *outside the category of sales for which origin was identified using the FIFO-inference step (rather than the two earlier steps)*."[68]  Therefore, although we are no longer applying AFA to Bosun's sales identified using the first steps in its country-of-origin identification methodology, we have continued to apply AFA to all of Bosun's sales for which the country of origin was identified using the FIFO methodology.

Comment 4:  Whether Commerce Should Apply Neutral Facts Available to Bosun's FIFO Sales

*Bosun's Comments*

- Commerce should apply neutral facts available to Bosun's FIFO sales.[69]
  - Commerce's determination to apply adverse facts available to Bosun's entire universe of FIFO sales is not supported by substantial evidence because Bosun cooperated to the best of its ability throughout the review and was completely transparent about the

---

[67] *See* Bosun's Letter, "Supplemental Questionnaire Response," dated September 7, 2016 at 2-3, 15-17; Bosun's Letter, "Second Supplemental Questionnaire Response," dated November 11, 2016 at 1-3 and Exhibits S2-2 and S2-3; Bosun Verification Report at 9-11.
[68] *DSBs*, 986 F.3d at 1367 (emphasis added).
[69] *See* Bosun's Comments at 9-12.

issues and its proposed approach to the issues, which, in fact, Commerce accepted until it reconsidered its verifiers' findings in the context of the appeals.[70]

o   The CAFC affirmed only Commerce's decision to apply facts available under sections 776(a)(1) and (a)(2)(D) of the Act due to the error discovered during verification.[71]

o   It is unreasonable to apply AFA to the FIFO-identified sales because section 776(b) of the Act allows Commerce to apply an adverse inference in selecting among facts otherwise available if a party failed to cooperate to the best of its ability to comply with a request for information.[72]

o   Bosun's U.S. customers do not specify or care whether they are buying a Chinese – or Thai – origin blade, which is why the sales documents from Bosun Tools or Pioneer USA to their unaffiliated U.S. customers do not specify whether the sawblade sold was of Chinese or Thai origin.[73]

o   Commerce's determination that Bosun was able to, and should, have known and tracked the country of origin on the sale documents to the U.S. customers completely overlooks Bosun's unique circumstances.[74]

o   The AFA statute exists, significantly, as an inducement to cooperation; not as a hammer to dissuade or punish cooperation.[75]

o   The assessment of whether a respondent complied to the best of its ability should consider the respondent's efforts throughout the process, and not disproportionately

---

[70] *Id*. at 9.
[71] *Id*.
[72] *Id*. at 10.
[73] *Id*.
[74] *Id*. at 10-11.
[75] *Id*. at 12.

focus on what the respondent could have done better before the administrative review.[76]

o   Commerce lacks a factual or legal predicate to apply an adverse inference to Bosun with respect to the FIFO sales.[77]

**Commerce's Position**:  We have continued to use an adverse inference when selecting from among the facts otherwise available with respect to Bosun's FIFO sales for these final results of redetermination.  As described above, the CAFC's concern was that we applied AFA to sales for which information was not missing (*i.e.*, Bosun's non-FIFO sales).  With respect to the application of AFA to Bosun's FIFO sales, however, the CAFC held that "{n}either Commerce nor the Trade Court misinterpreted our holdings in *Nippon Steel* or *Peer Bearing* regarding the "best of its ability" standard of {section 776(b) of the Act}."[78]   As explained above, the CIT cited *Nippon Steel* and *Peer Bearing* in explaining that "the 'best of its ability' standard 'requires the respondent to do the maximum it is able to do,' inclusive of 'maintaining full and complete records' of relevant data."[79]  Notably, the CIT explained that finding that Bosun met the "best of its ability" standard "would appear to be at odds with appellate precedent on the meaning of 'best of its ability' standard and the facts on the record at bar{.}"[80]  Therefore, the CAFC's opinion supports our finding that the FIFO methodology is unreliable for determining country of origin and that Bosun's failure to maintain country-of-origin information is inconsistent with acting to the best of its ability.  Accordingly, although we are no longer applying AFA to the non-FIFO-identified sawblades, we continue to find that AFA is appropriate with respect to sawblades

---

[76] *Id.*
[77] *Id.*
[78] *See DSBs*, 986 F.3d at 1367.
[79] *First Remand Order* at 10.
[80] *Id.* at 9.

identified using the unreliable FIFO methodology.  Thus, contrary to Bosun's assertions, the CAFC did, in fact, rule that Commerce's use of adverse inferences with respect to Bosun's FIFO sales pursuant to section 776(b) of the Act is in accordance with law.

Finally, we disagree with Bosun that we lack the factual or legal predicate to apply an adverse inference when selecting from among the facts otherwise available with respect to Bosun's FIFO sales.  Specifically, Bosun argues that "the assessment of whether a respondent complied to the best of its ability should take into account the respondent's efforts throughout the process, and not disproportionately focus on what the respondent could have done better before the administrative review."[81]  We find that Bosun's argument is contradicted by the findings of the CIT and the CAFC.  The CIT explained, citing *Nippon Steel*, that the "best of its ability" standard "applies to not only malfeasant conduct but to 'inattentiveness, carelessness, or *inadequate* recordkeeping.'"[82]  The CIT also cites *Peer Bearing* for its statement that the standard requires respondents "to take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable {respondent} should anticipate being called upon to produce."[83]  Again, the CAFC held that neither Commerce nor the CIT misinterpreted *Nippon Steel* or *Peer Bearing*.[84]  Accordingly, we continue to find that applying AFA to Bosun for its failure to maintain country-of-origin records is appropriate for sawblades identified using the FIFO step of Bosun's identification methodology.

---

[81] *See* Bosun's Comments at 12.
[82] *See First Remand Order* at 11 (emphasis added by the CIT).
[83] *Id.* at 13.
[84] *DSBs*, 986 F.3d at 1367.

<u>Comment 5:  Limiting the Application of AFA to Information That Is Missing</u>

*Bosun's Comments*

- Even if Commerce were to apply AFA, the AFA application must be limited to information that is missing.[85]

  - The application of AFA to Bosun's sales is impermissible under sections 776(a) and (b) of the Act because the only "missing information" is the origin of the FIFO sales.[86]

  - Bosun's FIFO method was employed for the sole purpose of determining origin of the sales, and therefore, the only "missing information" on the record is the origin information of the FIFO sales.[87]

  - Commerce must use reported sales price information to calculate a dumping margin for reported FIFO sales.[88]

    - Bosun has previously reported the sale prices in its U.S. sales database for transactions previously identified as Chinese-origin sales under the FIFO method.[89]

    - For those sales, "the reliability of the reported sales prices has not been called into question and there is no informational gap in the sale prices for Commerce to fill."[90]

---

[85] *Id.* at 13-17.
[86] *Id.* at 13.
[87] *Id.*
[88] *Id.* at 13-15.
[89] *Id.* at 15.
[90] *Id.* (citing *Dillinger France I in France v. United States*, 981 F.3d 1318, 1364 (CAFC 2020)).

- ▪ Commerce cannot ignore the uncontested sales price information provided in Bosun's U.S. sales database for the reported FIFO sales and must assign a calculated margin to such sales.[91]

- o Commerce should request sales information for the non-reported FIFO sales.[92]

  - ▪ The non-reported FIFO sales were not reported only because Commerce accepted Bosun's methodology in its initial questionnaire response and throughout the review.[93]

  - ▪ Now that Commerce has decided that the FIFO method to segregate Chinese-origin from non-Chinese sawblades is unreliable, its supplemental questionnaire should have requested a full U.S. sales file for that entire subset of sales.[94]

  - ▪ The unique procedural posture in this remand proceeding is that Commerce already reopened the record and requested Bosun to identify specific FIFO sales transactions in Bosun's U.S. sales database; Commerce, thus, has no basis not to request Bosun to submit specific and detailed sales information for the sales previously excluded under the FIFO method.[95]

  - ▪ If Commerce were to apply adverse inferences to treat the non-reported FIFO sales as Chinese-origin sales, Commerce has an obligation to notify Bosun that the pricing information is not on the record and provide Bosun an opportunity to supplement the record under section 782(d) of the Act.[96]

---

[91] *Id.*
[92] *Id.* at 15-17.
[93] *Id.* at 15.
[94] *Id.*
[95] *Id.* at 16.
[96] *Id.* at 16-17.

- Commerce's application of an AFA rate to all of Bosun's sales previously excluded by the FIFO method is contrary to the law because Commerce never provided Bosun with an opportunity to correct this newly perceived deficiency in its reporting.[97]

**Commerce's Position**:  We have not modified our application of AFA to Bosun's FIFO sales as suggested by Bosun for these final results of redetermination.  While Bosun is correct that the missing information is the country of origin of its FIFO sales, that information is crucial to the calculation of the dumping margin.  Specifically, the country of origin is necessary to determine whether a particular sale is properly included or excluded from the U.S. sales database.  Thus, although Bosun asserts that it "has previously reported the sale prices in its U.S. sales database for transactions previously identified as Chinese-origin sales under the FIFO method,"[98] because we find the FIFO methodology unreliable for determining the country of origin for Bosun's sales, we cannot reliably determine whether those sales are actually of Chinese origin.  Moreover, the reason we cannot reliably determine country of origin is because Bosun did not act to the best of its ability in maintaining actual, accurate country-of-origin records with respect to its imported sawblades.

This deficiency cannot be resolved by simply having Bosun report all of its sales regardless of country of origin as Bosun suggests.  Simply inferring that all the sales identified using the FIFO methodology are Chinese-origin sales but otherwise using the pricing information for such sales in calculating a margin is not necessarily an inference adverse to Bosun.  First, doing so could involve calculating margins for sales of non-subject merchandise (*i.e.*, Thai sawblades) and including them in the weighted-average margin applicable to subject

---

[97] *Id.* at 17.
[98] *See* Bosun's Comments at 15.

merchandise (*i.e.*, Chinese sawblades).  Second, calculating a margin for all of Bosun's sales regardless of country of origin could affect the product mix so that certain models (*i.e.*, that were produced both in China and Thailand) would have outsized influence on the weighed-average margin relative to models that were produced only in China.  To the extent that either of these scenarios occurs, the weighted-average dumping margin (and corresponding assessment rates) may be distorted.  Because of the potential for distortion, following Bosun's proposal could result in a more favorable margin for Bosun than if Bosun had acted to the best of its ability by maintaining reliable country-of-origin information.  As explained above, we continue to find that adverse inferences are warranted for Bosun with respect to its FIFO-identified sales.

Bosun argues that Commerce cannot apply AFA to all the FIFO-identified sales because Commerce did not give Bosun an opportunity to remedy this newly perceived deficiency.  As we explain above, however, providing the sales information for all of the FIFO-identified sales would not remedy the deficiency—which is the lack of reliable country-of-origin information for those sales.  Therefore, for purposes of determining Bosun's weighted-average dumping margin, we continue to find it appropriate, as AFA, to apply the AFA rate of 82.05 percent to all of Bosun's FIFO-identified sales, as explained above.

## V.     FINAL RESULTS OF REDETERMINATION

Pursuant to the *Remand Order*, we have reconsidered our determination as described above.  For this final redetermination pursuant to remand, we recalculated the rate for Bosun as described above.  We applied the margin we recalculated for Bosun as the separate rate to eligible non-selected respondents.  The rates determined in these final results of redetermination are as follows:

| Company | Final Results Margin (Percent) | Remand Margin (Percent) |
|---|---|---|
| Bosun Tools Co., Ltd. | 6.19 | 15.91 |
| Chengdu Huifeng Diamond Tools Co., Ltd. | 6.19 | 15.91 |
| Danyang Hantronic Import & Export Co., Ltd. | 6.19 | 15.91 |
| Danyang Huachang Diamond Tools Manufacturing Co., Ltd. | 6.19 | 15.91 |
| Danyang Like Tools Manufacturing Co., Ltd. | 6.19 | 15.91 |
| Danyang NYCL Tools Manufacturing Co., Ltd. | 6.19 | 15.91 |
| Danyang Weiwang Tools Manufacturing Co., Ltd. | 6.19 | 15.91 |
| Guilin Tebon Superhard Material Co., Ltd. | 6.19 | 15.91 |
| Hangzhou Deer King Industrial and Trading Co., Ltd. | 6.19 | 15.91 |
| Hangzhou Kingburg Import & Export Co., Ltd. | 6.19 | 15.91 |
| Huzhou Gu's Import & Export Co., Ltd. | 6.19 | 15.91 |
| Jiangsu Inter-China Group Corporation | 6.19 | 15.91 |
| Jiangsu Youhe Tool Manufacturer Co., Ltd. | 6.19 | 15.91 |
| Qingyuan Shangtai Diamond Tools Co., Ltd. | 6.19 | 15.91 |
| Quanzhou Zhongzhi Diamond Tool Co., Ltd. | 6.19 | 15.91 |
| Rizhao Hein Saw Co., Ltd. | 6.19 | 15.91 |
| Saint-Gobain Abrasives (Shanghai) Co., Ltd. | 6.19 | 15.91 |
| Shanghai Jingquan Industrial Trade Co., Ltd. | 6.19 | 15.91 |
| Sino Tools Co., Ltd. | 6.19 | 15.91 |
| Weihai Xiangguang Mechanical Industrial Co., Ltd. | 6.19 | 15.91 |
| Wuhan Wanbang Laser Diamond Tools Co., Ltd. | 6.19 | 15.91 |
| Xiamen ZL Diamond Technology Co., Ltd. | 6.19 | 15.91 |
| Zhejiang Wanli Tools Group Co., Ltd. | 6.19 | 15.91 |

The cash deposit rates for all of the above companies, with the exception of Danyang Hantronic Import & Export Co., Ltd., have been superseded in subsequent reviews.[99]  Therefore, the final results of this redetermination pursuant to remand will not affect the cash-deposit rate for any of the companies listed above with the exception of Danyang Hantronic Import & Export Co., Ltd.  Because the cash-deposit rate for Danyang Hantronic Import & Export Co., Ltd., has

---

[99] *See*, *e.g.*, *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 17527, 17528 (April 20, 2018).

not been superseded in any subsequent review, the cash-deposit rate for this company will be revised at the conclusion of this litigation unless it is subject to a subsequent review of this order which is completed prior to the conclusion of this litigation.[100]

Should the Court affirm the final results of redetermination, Commerce intends to issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the determination above.

7/13/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

---

[100] We note that we preliminarily determined that Danyang Hantronic Import & Export Co., Ltd., was not eligible for a separate rate and treated it as part of the China-Wide Entity.  *See Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission of Review in Part; 2018-2019*, 86 FR 14873, 14876 (March 19, 2021).  However, that administrative review is not yet final.