*PUBLIC VERSION*

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| THE DIAMOND SAWBLADES MANUFACTURERS' COALITION<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>UNITED STATES<br>　　　　　　Defendant,<br><br>　　　and<br>BOSUN TOOLS CO., LTD.,<br><br>　　　　　　Defendant-Intervenor | Ct No. 17-00167<br><br>**PUBLIC VERSION** |

## DEFENDANT-INTERVENOR BOSUN TOOLS CO., LTD. COMMENTS ON SECOND REMAND REDETERMINATION

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C., 20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Bosun*

Dated: August 12, 2021

**TABLE OF CONTENTS**

I.   Procedural History ................................................................................................... 2

II.  Argument .................................................................................................................. 5

    A.   The Court Should Order Commerce To Eliminate Intracompany Sales from Its Calculations ................................................................................... 5

    B.   Commerce Should Have Applied Neutral Facts Available to Bosun's POR 6 FIFO-Inferenced Sales ................................................................................ 8

    C.   Even If the Court Upholds Commerce's Application of AFA, the AFA Application Must Be Limited to Information That Is Missing ................... 12

III. Conclusion .............................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021)....... *passim*

*Diamond Sawblades Mfrs.' Coalition v. United States*, No. 17-00167, Slip Op. 2018-146, 2018 Ct. Intl. Trade LEXIS 155 (Ct. Int'l Trade Oct. 23, 2018)........................................................3

*Diamond Sawblades Mfrs.' Coal. v. United States*, 415 F. Supp. 3d 1365 (Ct Int'l Trade 2019) ...................................................................................................................................4

*Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1348 (Ct Int'l Trade 2018).............. 14-15

*Dillinger Fr. S.A. v. United States*, 383 F. Supp. 3d 1225 (Ct Int'l Trade 2019) ..........................14

*DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338, 1345-46 (Ct Int'l Trade 2014) ................................................................................................................................8

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ................................................11

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) .......................11

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ......................................................................................................................... 7-8, 11

*Holmes Products Corp. v. United States*, 795 F. Supp. 1205 (Ct. Int'l Trade 1992) .....................8

*Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020)...........7

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed Cir. 2003)........................................7, 9

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376 (CAFC 2001) ....................................................................................................................7

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ....................7

*Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ........................7

*Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1333 (Ct. Int'l Trade 2015) ................................................................................................................................8

**Statutes**

19 U.S.C. § 1677e ............................................................................................................. *passim*

**Other Legal Authority**

URAA Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 870, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199 ................................................................................................11

*PUBLIC VERSION*

**DEFENDANT-INTERVENOR BOSUN TOOLS CO., LTD.
COMMENTS ON SECOND REMAND REDETERMINATION**

Defendant-Intervenor Bosun Tools Co. Ltd. and its affiliates Bosun Tools Inc. and Pioneer Tools, Inc. (collectively, "Bosun"), hereby comment on the Department's Remand Redetermination dated July 13, 2021.  Dep't Commerce, Final Remand Redetermination pursuant to CAFC Appeal 20-1478; **ECF Doc. No. 74-1** ("Second Remand Results").

This case arises from Bosun's country of origin identification method employed in the sixth administrative review of *Diamond Sawblades from China* AD Order.  Bosun distinguished subject sales from China and non-subject sales from Thailand through a multi-step analysis, including using a first-in-first-out (FIFO) methodology.  In the Second Remand, Commerce followed only a portion of the Court of Appeals for the Federal Circuit's ("CAFC") instruction to determine whether facts available ("FA") under 19 U.S.C. § 1677e(a) can be applied to sales for which their origin information is identified through the first two steps, *i.e.*, the non-FIFO steps. *See Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021) ("DSB CAFC").  Commerce properly determined that it cannot apply FA to the sales determined by the first two steps, accepting them as filed. *See* Second Remand Results at 2-3.  Commerce determined to apply AFA to only the sales that Bosun identified county of origin by the third step, the FIFO methodology.  In the draft remand, Commerce made a clerical error in identifying FIFO sales reported in the U.S. sales database by the serial number in the Second Remand Supplemental Questionnaire instead of the sequence numbers.  The Department corrected this error in the final Second Remand Results, assigning Bosun a margin of 15.91 percent.  Second Remand Results at 23.

While Bosun supports the Department determination that it has no basis to apply total

1

PUBLIC VERSION

AFA or find any deficiency in its reporting for sales identified by the first two steps, Bosun maintains that certain aspects of the Department's second remand results are not supported by substantial evidence or otherwise in accordance with the law.

First, Commerce should eliminate intracompany sales from its calculation. Second, Commerce's remand results applying AFA with respect to all the FIFO-identified sales is unsupported by record evidence and contrary to law because Bosun cooperated to the best of its ability in this review and provided the information requested. Lastly, having accepted the above-referenced methodology throughout the review itself, if Commerce is now rejecting a part of the methodology, it has the legal obligation to provide Bosun with the opportunity to correct or clarify its selection of subject sales for the POR; but Bosun was only partially given this opportunity in Commerce's Remand Supplemental Questionnaire. Thus, the Court should order the Department to reconsider how it can, for the reported-FIFO sales, use the reported sales price information to calculate the dumping margin. Commerce's method of applying a per-unit AFA amount to *all* FIFO-identified sales is unsupported by substantial evidence and contrary to the law when the only missing information is the origin information, not the price for at least a significant portion of these sales.

**I.      Procedural History**

Bosun was selected as a replacement mandatory respondent in the review after the two respondents initially selected for individual review were withdrawn from the review. During the review, Bosun timely submitted its initial questionnaire responses and supplemental questionnaire responses. In this initial questionnaire response, Bosun also explained that it had two affiliated trading companies in the U.S. during the POR: Bosun Tools, Inc. ("Bosun Tools") and Pioneer Tools, Inc. ("Pioneer"). As Commerce must rely upon the sales information to the

*PUBLIC VERSION*

first unaffiliated customer, the sales data of both Bosun Tools and Pioneer to their unaffiliated customers would be used as the sales information, per Commerce's normal practice. Bosun thus developed a country-of-origin identification method to segregate sales of Chinese and Thai blades by three steps – unique products codes, unit price, and lastly, the first-in-first-out (FIFO) methodology. FIFO is, in fact, a normal business practice employed by Bosun and a logical and neutral method of conferring origin for the sales. FIFO is also a widely accepted accounting principle to determine which goods are treated as sold in an accounting period for cost purposes. Commerce conducted a sales verification of Bosun that was limited to the sales origin identification methodology and the quantity and value reconciliation of Bosun's reported U.S. sales. Final IDM at 27. Commerce was fully satisfied from that specific review that Bosun's methodology was complete and reliable. *Id.* at 28.

Petitioner took appeal of the review to this court, arguing that Commerce should have applied total AFA to Bosun or, in the alternative, Commerce should have applied partial AFA to the sales identified by the FIFO methodology. The lower court in *DSMC I* remanded the decision back to Commerce for reconsideration of the factual and legal basis that Bosun submitted a reliable U.S. sales file and Commerce's finding that Bosun cooperated to the best of its ability in the review. *Diamond Sawblades Mfrs.' Coalition v. United States*, No. 17-00167, Slip Op. 2018-146 at 16-17, 2018 Ct. Intl. Trade LEXIS 155 (Ct. Int'l Trade Oct. 23, 2018) ("*DSMC I*").

On remand, Commerce found that Bosun's sales database was unreliable *entirely* and that Bosun did not cooperate to the best of its ability. Commerce found that the same record then lacked "direct" country of origin information and that the single error found at verification with respect only to the FIFO identification was not necessarily isolated. *See* Department of

Commerce, Remand Redetermination (April 17, 2019).  The remand redetermination was sustained.  *See Diamond Sawblades Mfrs.' Coal. v. United States*, 415 F. Supp. 3d 1365 (Ct Int'l Trade 2019) ("*DSMC II*").

Bosun appealed to the CAFC Commerce's decision to disregard the entirety of Bosun's origin information and to apply total AFA to all of Bosun's reported sales.  On January 27, 2021, the CAFC reversed Commerce's total AFA as applied to Bosun after it found that record evidence does not contain a "supported basis for finding the Bosun-supplied information unreliable outside the category of sales for which origin was identified using only the FIFO-inference step (rather than the two earlier steps)."  *See DBS CAFC*, 986 F.3d 1351, at 1367.

Prior to rendering the Second Remand results, Commerce re-opened the record and issued a supplemental questionnaire to Bosun.  In response to this targeted supplemental questionnaire, Bosun identified, among the universe of sales for which the FIFO methodology was applied (*i.e.*, the FIFO-identified sales), which sales were identified as sales *from China*, which were identified as sales *from Thailand*, and which were *intra-company sales*.  *See* Bosun's Supplemental Questionnaire Response for Remand (April 19, 2021); **Rem. CR2**, **Rem. PR2**.

In the Second Remand Results, Commerce determined that it cannot apply FA under § 1677e(a) to the non-FIFO sales because there were "no reliability concerns regarding Bosun's country-of-origin information for sales identified using either of the first two steps in the identification methodology", and therefore, there is no basis for "disregarding the country-of-origin information for such sales."  *See* Second Remand Results at 4.

With respect to the FIFO-identified sales, after concluding that necessary information is missing from the record, Commerce found that "Bosun failed to maintain full and complete records regarding country of origin, despite its apparent ability to do so, and despite its

4

PUBLIC VERSION

familiarity with Commerce proceedings and awareness of the need for distinguishing the country of origin of its merchandise for export…Bosun failed to cooperate to the best of its ability in responding to Commerce's requests for information within the meaning of {section 1677e(b)}." *Id.* Commerce applied the AFA rate of 82.05 percent to all the reported-FIFO sales, extrapolated that AFA-derived per-unit amount out to unreported FIFO sales (i.e., the sales treated as non-Chinese origin sales) and intra-company sales, and, finally, weight-averaged the AFA margin with calculated margins for non-FIFO sales. *Id.* at 6.

**II.     Argument**

    **A.     The Court Should Order Commerce To Eliminate Intracompany Sales from Its Calculations.**

In the Second Remand Results, as detailed in the Draft Calculation Memo, Commerce first applied the AFA rate of 82.05 percent to all FIFO-identified sales Bosun reported in its U.S. sales database. *See* Draft Remand Calculation Memo at 2; **Rem. CR5**, **Rem. PR5**. From there, Commerce calculated the per-unit amount AFA margin, and then "applied the per-unit amount to the quantity of FIFO-identified sales which Bosun did not report in its U.S. sales database (*i.e.*, the difference in quantity between the total quantity of FIFO-identified sales indicated in the verification report and the total quantity of FIFO-identified sales which Bosun reported in its U.S. sales database)." *Id.* However, because the quantity of the total FIFO-identified sales indicated in the verification report includes *intra-company* sales, the difference of that and the total quantity of FIFO-identified sales that Bosun reported in its U.S. sales database still includes intra-company sales. These were not sales of the companies to unaffiliated downstream U.S. customers and thus there is no basis at all to include them as Bosun's U.S. sales or apply any adverse inference pertaining to these sales.

5

*PUBLIC VERSION*

The quantity of total FIFO-identified sales indicated in the verification report is [   ] transactions, or [   ] pieces, from Bosun Tools and [   ] transactions, or [   ] pieces, from Pioneer.  *See* Verification Report at 11; **CR365**, **PR383**.  Among Pioneer's [   ] transactions, [   ] transactions were from Pioneer to affiliated company Bosun Tools.  *See* Remand Supplemental Questionnaire at 2 & Exhibit SQ-2 (April 19, 2021); **REM. CR2, REM. PR2**.  Bosun understands that, in order to eliminate the [   ] transactions from the pool of non-reported FIFO sales, Commerce needed the total piece number of these [   ] transactions.  Commerce did not specifically request this fact in its targeted Remand Supplemental Questionnaire, but Bosun informed the Department that there were in fact a total of [   ] pieces of sawblades from these [   ] transactions but it was clearly within the purpose of Commerce's question.

Bosun raised this issue in its draft remand comments, requesting that the Department deduct these intracompany sales from the calculations associated with the FIFO sales not reported in the U.S. sales database.  In response, Commerce merely observes that Bosun had not previously identified the exclusion of intracompany sales in the FIFO identification steps.  Second Remand Results at 15.  Commerce also claims because it was not aware of the intracompany sales until Bosun's remand comments, it was unable to verify this information or otherwise analyze these claims.  *Id*.  Of course, Commerce did verify the entire FIFO methodology in the original review and found no issues with the reliability of its methodology.  Commerce replicated the country-of-origin methodology at verification, and was aware of this process even if it was not specifically identified in the verification report.  As Commerce is aware, at verification Commerce would not have seen the need to comment on this as Commerce accepted the methodology *overall* and did not decide it needed to segregate all sales identified under the FIFO methodology.  When this need arose in this second remand, Commerce certainly

6

*PUBLIC VERSION*

could have further analyzed this or verified this information, but chose not to do so of its own accord.

The record establishes that there were intracompany sales from Pioneer to Bosun. *See* Remand Supplemental Questionnaire at 2 & Exhibit SQ-2 (April 19, 2021); **REM. CR2, REM. PR2**. Therefore, these are definitively not sales to unaffiliated downstream U.S. customers and have no basis to be included in the sales database. These are facts on this very record in Bosun's latest supplemental questionnaire response that legally cannot be ignored. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ("[T]he substantial evidence standard requires review of the entire administrative record…"); *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1348 (Ct. Int'l Trade 2020) (internal citations omitted) ("The record includes everything that is before the agency when it makes its decision, regardless of what the agency relied on or found persuasive in making its determination.").

Further, ignoring the fact that there are intracompany sales is contrary to Commerce's mandate to calculate accurate margins. *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (CAFC 2001) ("We reasoned that the purpose of the statutory provisions is to determine antidumping margins 'as accurately as possible.'"); *Citing Lasko Metal Prods. v. United States*, 43 F.3d 1442 (CAFC 1994). Including sales that are not to unaffiliated U.S. customers results in a less accurate margin. *See Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1373 (Ct. Int'l Trade 2007) (It is true that Commerce has an obligation to calculate the most accurate dumping margin possible even when applying adverse facts available.) *citing Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002)(*citing F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (noting that "[i]t is clear . . . that [Congress] intended for an

7

*PUBLIC VERSION*

adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance")).

Indeed, including the intracompany sales inherently introduces double-counting. With intracompany sales from Pioneer to Bosun included in the database and then sales from Bosun to third parties included in the database, intracompany sales would be double-counted. *Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1333 (Ct. Int'l Trade 2015) ("The caselaw holds that, as a general rule, double counting is not permitted in antidumping margin calculations, because it is distortive, rendering margins less accurate."); *Citing DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338, 1345-46 (Ct Int'l Trade 2014) (ruling that "double counting should be avoided, as it does not provide a fair price comparison"); *Holmes Products Corp. v. United States*, 795 F. Supp. 1205, 1207-08 (Ct. Int'l Trade 1992) (holding that "[d]ouble-counting is to be avoided"). The Court must order the Department to remove intracompany sales from its calculation.

### B. Commerce Should Have Applied Neutral Facts Available to Bosun's POR 6 FIFO-Inferenced Sales.

Commerce's determination to apply adverse facts available to Bosun's entire universe of FIFO-inferenced sales is not supported by substantial evidence because Bosun cooperated to the best of its ability throughout AR 6 and was completely transparent about the issues and its proposed reasonable approach to the issues, which, in fact, Commerce accepted until it reconsidered its verifiers' findings in the context of the appeals. The CAFC affirmed only Commerce's decision apply facts available under §§ 1677e(a)(1) & (a)(2)(D) due to the error discovered during verification. *DSB CAFC*, at 1363-64. The court further held:

> Notably, this is not a case involving withholding of information, failure to meet timing, form, or manner requirements, or significant impeding of a proceeding,

> under § 1677e(a)(2)(A), (B), and (C). Such situations implicate a policy of cooperation with Commerce that is evident on the face of those statutory provisions, as it is evident on the face of § 1677e(b). The relevance of such a policy is not as facially evident at the § 1677e(a) stage where, as here, applying § 1677e(a) involves only missing or unverifiable information, under § 1677e(a)(1) and (a)(2)(D). We need not go further than note the facial difference between these and the other preconditions for application of § 1677e(a).

*Id.* at 1365. Indeed, missing and unverifiable information that warrants FA under §§ 1677e(a)(1) & (a)(2)(D), as the FIFO-identified sales are, does **not** imply a lack of cooperation with Commerce that is evident on its face. *Id.*

It is unreasonable to apply AFA to the FIFO-identified sales because § 1677e(b) allows Commerce to apply an adverse inference in selecting among facts otherwise available if a "party failed to cooperate to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). The CAFC has held that the "best of its ability" standard "does not require perfection", and it is satisfied when a respondent does "the maximum it is able to do." *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Bosun responded robustly to all requests for information during the course of the review and cooperated to the best of its ability.

Commerce found that "Bosun failed to maintain full and complete records regarding country of origin, despite its apparent ability to do so, and despite its familiarity with Commerce proceedings and awareness of the need for distinguishing the country of origin of its merchandise for export." *See* Second Remand Results at 5. Essentially, because Bosun did not record the country of origin on its U.S. sales records to downstream unaffiliated customers within the United States, Commerce has determined that Bosun did not act to the best of its ability. However, critically, Bosun's U.S. customers do not specify or care whether they are buying a Chinese- or Thai- origin blade, which is why the sales documents from Bosun Tools or Pioneer

9

Case 1:17-cv-00167-CRK   Document 78   Filed 08/12/21   Page 14 of 20

*PUBLIC VERSION*

to their unaffiliated U.S. customers do not specifically reflect whether the sawblade sold was of Chinese or Thai origin.

In the same vein, Commerce determined that because Bosun has been a mandatory respondent in previous segments, Bosun was able to and should have known and tracked the country of origin on the sale documents to the U.S. customers. This characterization of Bosun's position in these reviews completely overlooks Bosun's unique circumstances. After AR 4, Bosun had switched its main manufacturing operations for exports to the U.S. to Thailand as a business decision and dropped out of the top tier of Chinese exporters of subject merchandise. In fact, Bosun was not selected as a mandatory respondent in AR5, AR7, AR8, AR9, or AR10. Bosun likewise would not have been selected in AR6 but for the withdrawal of the review requests for the two respondents initially selected. Therefore, Bosun never before had to contemplate maintaining multiple origin sales documents because when it was a mandatory respondent in prior reviews; it had only supplied the United States from China.

Upon being selected as a mandatory respondent in AR6, Bosun was able to use definitive information maintained in its normal books and records to determine the origin of the vast majority of its sales. For the remainder[1] of the sales, Bosun acted to the best of its ability to find the most reliable and neutral method to determine country of origin. FIFO is a logical assumption used in the industry because companies want to sell older inventory before offering

---

[1] Commerce appears to doubt Bosun's calculation that less than 2.5% of the sales were determined by the FIFO methodology. *See* Second Remand Results at 6, footnote 18. Commerce's calculation is not a fair percentage calculation because the numerator includes all FIFO-sales, *i.e.*, both Chinese-origin and Thai-origin sales, while the denominator includes only sales of Chinese-origin blades. *See id.*, citing page 360 of the program output attached to the Remand Calculation Memo. But Bosun provided the calculation in the comment to the first remand calculation that used the Chinese-origin FIFO-sales only. *See* Bosun's Remand Comments to the First Remand at 7 (June 3, 2019) ECF 47. [ ] Chinese-origin FIFO identified sales out of a total [ ] Chinese-origin sales during the POR = [ ]% of the sales database. *Id*.

newer inventory for a variety of reasons but particularly when the product can potentially degrade, rust, etc., under prolonged storage.  FIFO is also neutrally applied to the purchase records and cannot be manipulated, or cherry picked, to favor the country identification one way or the other.

Moreover, the AFA statute exists, significantly, as an inducement to cooperation; not as a hammer to dissuade or punish cooperation.  The CAFC stated in numerous instances that "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational…margin." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *see e.g., Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("The purpose of the adverse facts statute is to provide respondents with an incentive to cooperate with Commerce's investigation, not to impose punitive damages."); URAA Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 870, reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ("Where a party has not cooperated, Commerce…may employ adverse inferences…to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.").  The application of the neutral FIFO methodology to Bosun's remaining sales in no way can be characterized as enabling Bosun to obtain a more favorable result than if it had somehow cooperated more fully.

The assessment of whether a respondent complied to the best of its ability should take into account the respondent's efforts *throughout* the process, and not disproportionately focus on what the respondent could have done better *before* the administrative review.  If Commerce limited its assessment to recordkeeping in a respondent's normal business before the

*PUBLIC VERSION*

administrative review, then no respondents who are aware of a difficulty in recordkeeping would cooperate, because no matter what effort such respondent put forth, it will only receive AFA regardless. Quite the contrary, Commerce should effectuate the statutory purposes of the AFA rule to induce and encourage respondents to cooperate, including throughout the investigation. As such, Commerce lacks a factual or legal predicate to apply an adverse inference to Bosun with respect to the FIFO-identified sales.

      **C.    Even If the Court Upholds Commerce's Application of AFA, the AFA Application Must Be Limited to Information That Is Missing.**

Bosun maintains that Commerce should apply neutral FA to the FIFO-identified sales. However, even if this Court upholds that AFA is warranted, Commerce's remand result is still unreasonable. In the Second Remand, Commerce applied the AFA rate of 82.05 percent to all FIFO-related sales, *i.e.*, the reported-FIFO sales in Bosun's U.S. sales database and the non-reported FIFO sales that were not included in Bosun's U.S. sales database. *See* Second Remand Results at 6; Draft Remand Calculation Memo at 2, **Rem. CR5**, **Rem. PR5**. In doing so, Commerce applied two sets of adverse inferences: first, Commerce treated the entire universe of U.S. sales that went through the FIFO step as Chinese blades (asserting that the origin information is unreliable), and second, Commerce applied the punitive 82.05 percent AFA-derived *unit rate* to all these blades determined by FIFO. Bosun submits that such AFA application is impermissible under §§1677e(a) & (b) because the only "missing information" is the origin of the FIFO-inferenced sales. Bosun's FIFO method was employed for the sole purpose of determining origin of the sales, and therefore, the only "missing information" on the record is the origin information of the FIFO-inferenced sales. *See DBS CAFC*, at 1364 ("As to those {FIFO} sales, the evidence supports a finding that ….. {the} ***origin information*** about

12

*PUBLIC VERSION*

those sales was missing. Commerce therefore properly found § 1677e(a) to apply in this matter.") {Emphasis supplied}. Therefore, in the worst case, the adverse inference for the FIFO-identified sales was that all the sawblades were of Chinese origin. With this understanding, Bosun presented two different ways that Commerce could calculate Bosun's margin limiting the AFA scope to the country of origin information. A reasonable method is discussed further below.

Commerce claimed it was not appropriate to determine that all sales were Chinese in origin and to calculate a margin accordingly because such a margin "is not necessarily an inference adverse to Bosun." Remand Results at 21. Commerce reasons that following this proposal "could result in a more favorable margin for Bosun than if Bosun had acted to the best of its ability by maintaining reliable country-of-origin information." *Id*. at 22. However, this argument fails to understand the circumstances when the FIFO methodology was applied. FIFO was only applied when the same model was produced in both Thailand and China and had the same unit price. Therefore, Commerce's hypothetical idea that "distortion" could occur is not supported by the record. The Chinese and Thai models were not discernably different by characteristics or price, which is why FIFO had to be used. It is not reasonable then to presume a notable distortion would lower the margin, when at most, Commerce would only be including some additional sales of the same model and price as the Chinese sales. Commerce certainly has not demonstrated how this would be materially favorable to Bosun.

Sales price information of FIFO sales that were reported in Bosun's section C database must be used for normal margin calculations like the rest of the reported U.S. sales (*i.e.*, the non-FIFO sales determined through Bosun's first two steps of the origin identification method). For reported-FIFO sales that were fully included in Bosun's section C database and treated as

13

PUBLIC VERSION

Chinese-origin blades, Commerce simply has no legal basis not to rely on those U.S. sales to assign a calculated dumping margin because the sales price information is on the record and uncontested.

Commerce cannot use adverse inference to substitute information that is on the record. *Dillinger France S.A. v. United States* is a case of high comparability to the issue presented in this case. *See generally*, *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1348 (Ct Int'l Trade 2018) ("*Dillinger France I*"). In that case, Dillinger was unable to report the actual manufacturer of some of the home market sales made by its affiliated service centers. *See id.* at 1361. Specifically, Dillinger reported the correct price for each and every transaction from its affiliated service center, while the only information that was missing was a small number of transactions for which the manufacturer is unknown, because CTL plates from various manufacturers are co-mingled in the service center's warehouse. *See id.* at 1362. Commerce applied AFA price to all such sales, after inferring that they were all produced by Dillinger. *See id.* at 1262-63. The CIT reversed, holding that Commerce impermissibly "replaced, known, unchallenged record information – the sales price recorded in transactions where the CTL plate's manufacturer was unknown – with adverse facts available." *Id.* at 1364. On remand, Commerce abandoned the AFA calculation method and instead, "applied AFA to the information missing from the record – the manufacturer of some of the plate in the disputed transaction – by attributing all sales to Dillinger", which was sustained by the Court. *Dillinger Fr. S.A. v. United States*, 383 F. Supp. 3d 1225, 1229 (Ct Int'l Trade 2019) ("*Dillinger France II*"), reversed on other grounds from *Dillinger France I* in *France v. United States*, 981 F.3d 1318 (Fed. Cir. 2020).

As noted above, Bosun has previously reported the sale prices in its U.S. sales database

14

PUBLIC VERSION

for transactions previously identified as Chinese-origin sales under the FIFO method. For those sales, "the reliability of the reported sales prices has not been called into question and there is no informational gap in the sale prices for Commerce to fill." *Dillinger France I*, at 1364. Thus, Commerce cannot ignore the uncontested sales price information provided in Bosun's U.S. sales database for the reported-FIFO sales. This Court should order Commerce to reconsider the record information and calculate a margin based on the U.S. sales database.

## III.   CONCLUSION

In conclusion, the Court should order Commerce to exclude the intra-company sales from the final margin calculation. Further, the Court should find that Commerce's application of AFA to all FIFO-identified sales is not supported by record evidence and is contrary to law. Bosun has complied to the best of its ability. Alternatively, even if this Court upholds Commerce's AFA application, it must be restricted to the actual missing information – the country of origin information. In that instance, after Commerce treats all FIFO-identified sales as in-scope Chinese sales, Commerce must calculate the dumping margin based on the sales price information already on the.

Respectfully submitted,

 /s/ *Gregory S. Menegaz*
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Bosun*

Date: August 12, 2021

*PUBLIC VERSION*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12-point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that these comments comply with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **4,602** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare these comments.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Bosun*