## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

| | |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' COALITION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Court No. 17-00167 ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| BOSUN TOOLS CO., LTD., | ) ) |
| Defendant-Intervenor. | ) ) |

_____)

### DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

PAUL KEITH
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce

JOHN J. TODOR
Senior Trial Counsel
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-2382
Fax: (202) 514-8640
Email: john.todor@usdoj.gov

September 13, 2021

Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE**

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 2

    I.     Proceedings Before Commerce ......................................................................... 2

    II.    The Court's First Remand Order ....................................................................... 4

    III.   Commerce's *First Remand Results* .................................................................. 6

    IV.   The Court's Opinion Sustaining The *First Remand Results*................................ 7

    V.    The Federal Circuit's Decision In *Diamond Sawblades* And The Second
         Remand Order ................................................................................................. 8

    VI.   Commerce's *Second Remand Results* And Bosun's Comments............................ 9

ARGUMENT ...............................................................................................................12

    I.     Standard Of Review ......................................................................................12

    II.    Relevant Legal Framework For Application Of Adverse Facts Available ..........12

    III.   Commerce's Application Of Adverse Facts Available To Bosun's
         FIFO-Identified Sales Complies With *DSMC III* And Is Supported By
         Substantial Evidence And In Accordance with Law............................................14

         A.    Commerce Reasonably Applied Adverse Facts Available To Bosun's
              FIFO-Identified Sales Because Commerce Reasonably Found That
              Bosun's FIFO Methodology Was Unreliable...........................................15

         B.    Bosun's Arguments To The Contrary Are Unavailing .............................15

              1.    Commerce Was Not Required To Exclude Intracompany Sales
                    Because Commerce Reasonably Found That Bosun's FIFO
                    Methodology Was Unreliable As A Whole .................................16

              2.    Commerce Was Not Required To Apply Neutral Facts Available
                    Because Commerce Reasonably Found That Bosun Failed To
                    Cooperate To The Best Of Its Ability .........................................17

              3.    Commerce Was Not Required To Accept Sales Price
                      Information For Sales With Missing Country-Of-Origin
                    Information Because Commerce Reasonably Found That Those
                    Sales May Not Be Subject Merchandise .....................................20

i

CONCLUSION..................................................................................................................22

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Bristol Metals L.P. v. United States,*
   703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010)........................................................12

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966).................................................................................................12

*Diamond Sawblades Mfrs. Coal. v. United States,*
   415 F. Supp. 3d 1365 (Ct. Int'l Trade 2019)..................................................8, 19

*Diamond Sawblades Mfrs. Coal. v. United States,*
   986 F.3d 1351 (Fed. Cir. 2021) ......................................................................passim

*Dillinger France S.A. v. United States,*
   350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018)......................................................22

*Dillinger France S.A. v. United States,*
   393 F. Supp. 3d 1225 (Ct. Int'l Trade 2019)......................................................22

*F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States,*
   216 F.3d 1027 (Fed. Cir. 2000) ...........................................................................21

*Nippon Steel Corp. v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003) .....................................................................passim

*Peer Bearing Co. v. United States,*
   766 F.3d 1396 (Fed. Cir. 2014) ............................................................ 13, 18, 19

*Tianjin Magnesium Int'l Co.. v. United States,*
   836 F. Supp. 2d 1377 (Ct. Int'l Trade 2012)......................................................12

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ..............................................................................12

19 U.S.C. § 1677e(a) ...................................................................................7, 9, 12

19 U.S.C. § 1677e(a)(1) ..................................................................................passim

19 U.S.C. § 1677e(a)(1) and (a)(2)(D) ................................................................17

19 U.S.C. § 1677e(a)(2) ......................................................................................12

19 U.S.C. § 1677e(a)(2)(B)-(C)............................................................................ 6

19 U.S.C. § 1677e(a)(2)(C) ............................................................................... 9

19 U.S.C. § 1677e(a)(2)(D) ............................................................................... 6

19 U.S.C. § 1677e(b) ............................................................................... passim

19 U.S.C § 1677e(c)(2) ............................................................................... 13

19 U.S.C § 1677e(d)(1)(B) ............................................................................... 13

19 U.S.C. § 1677e(d)(2) ............................................................................... 13

19 U.S.C. § 1677m(e) ............................................................................... 4, 5

19 U.S.C. § 3512(d) ............................................................................... 14

## ADMINISTRATIVE DETERMINATIONS

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*,
  80 Fed. Reg. 67,706 (Dep't of Commerce Nov. 3, 2015) ....................................... 2

*Antidumping and Countervailing Duty Administrative Reviews*,
  81 Fed. Reg. 736 (Dep't of Commerce Jan. 7, 2016) ........................................... 2

*Diamond Sawblades and Parts Thereof From the People's Republic of China*,
  81 Fed. Reg. 23,676 (Dep't of Commerce Apr. 22, 2016) ...................................... 3

*Diamond Sawblades and Parts Thereof From the People's Republic of China*,
  82 Fed. Reg. 26,912 (Dep't of Commerce June 12, 2017) ...................................... 2

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

| | |
|---|---|
| DIAMOND SAWBLADES<br>MANUFACTURERS' COALITION, ) ) ) ) | |
| Plaintiff, ) | |
| v. ) | Court No. 17-00167 |
| UNITED STATES, ) ) | |
| Defendant, ) ) | |
| and ) ) | |
| BOSUN TOOLS CO., LTD., ) ) | |
| Defendant-Intervenor. ) | |

_____ )

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

Pursuant to the Court's order of March 25, 2021, defendant, the United States, respectfully submits this response to the comments filed by defendant-intervenor, Bosun Tools Co., Ltd. (Bosun), regarding the United States Department of Commerce's (Commerce) July 13, 2021 redetermination pursuant to remand.  *See* Order, Mar. 25, 2021, ECF No. 71 (Second Remand Order); Final Remand Redetermination, July 13, 2021, ECF No. 74-1 (*Second Remand Results*); Bosun Comments on Remand Redetermination, Aug. 12, 2021, ECF No. 77 (Bosun Cmts.).  The Second Remand Order remanded the case to Commerce for further proceedings in conformity with the U.S. Court of Appeals for the Federal Circuit's opinion in *Diamond Sawblades Mfrs. Coal. v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) (*DSMC III*).  The *Second Remand Results* involve challenges to the final results in the sixth administrative review of the antidumping duty order on diamond sawblades and parts thereof (diamond sawblades) from the

People's Republic of China (China), covering the period of review from November 1, 2014 through October 31, 2015. *See Diamond Sawblades and Parts Thereof From the People's Republic of China*, 82 Fed. Reg. 26,912 (Dep't of Commerce June 12, 2017) (final results admin. review) (P.R. 404) (*Final Results*), and accompanying Issues and Decision Memorandum (P.R. 389) (Final IDM).[1]

For the reasons stated below, we respectfully request that the Court sustain Commerce's *Remand Results*.

<u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>

**I.   Proceedings Before Commerce**

In November 2015, Commerce published the opportunity notice for parties to request an administrative review of the antidumping duty order on diamond sawblades from China. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 80 Fed. Reg. 67,706 (Dep't of Commerce Nov. 3, 2015) (opp. to req. admin. review) (P.R. 1). The Diamond Sawblades Manufacturers' Coalition (DSMC) filed a review request for a number of exporters, including Bosun. DSMC Request for Administrative Review (Nov. 24, 2015) (P.R. 2). Bosun also requested that Commerce conduct an administrative review "so that an antidumping duty can be accurately calculated for Bosun's exports in the period of review." Bosun Request for Administrative Review (Nov. 30, 2015) (P.R. 6). In January 2016, Commerce initiated an administrative review for the period of November 1, 2014 to October 31, 2015. *Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 736 (Dep't of Commerce Jan. 7, 2016) (initiation) (P.R. 10).

---

[1] Citations to public documents from the administrative record are identified as "P.R. ___," while citations to confidential record documents are identified as "C.R. ___."

Although Bosun had been selected for review in three previous proceedings, Bosun was not initially selected for the underlying review. Commerce chose the two largest exporters, Husqvarna Co., Ltd. (Husqvarna) and Jiangsu Fengtai Diamond Tool Manufacture Co. (Jiangsu Fengtai), for review. Selection of Respondents for Individual Examination (Feb. 5, 2016) (P.R. 29). In April 2016, after DSMC and Husqvarna both withdrew their requests for administrative review of Husqvarna, Commerce rescinded the administrative review in part with respect to Husqvarna. *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 81 Fed. Reg. 23,676 (Dep't of Commerce Apr. 22, 2016) (rescission antidumping duty admin. rev. in part) (P.R. 174). As Bosun was the next largest exporter for which review was requested, Commerce selected Bosun for individual examination as a mandatory respondent. Second Respondent Selection Memo (Apr. 27, 2016) (P.R. 166; C.R. 117) (Second Respondent Selection Memo).

Although Bosun, through its U.S. affiliates, sold both Chinese-origin and Thai-origin diamond sawblades in the United States, Bosun did not record country-of-origin information for its sales. Final IDM at 27; Verification of the U.S. Sales Response of Bosun Tools Co., Ltd. (May 17, 2019) (Verification Report) (P.R. 383) at 4. In its questionnaire response, Bosun explained that, although Bosun's sales affiliates (Pioneer and Bosun USA, respectively) sold diamond sawblades in the U.S. from both Thailand and China, Bosun did not maintain records of the country-of-origin of its U.S. sales. Sections C & D Questionnaire Response (July 1, 2016) (P.R. 199) at C-1-C-3. Bosun claimed the ability to segregate its Thailand sales from its China sales retroactively by adhering to the following set of principles:

> (1) identifying the models of sawblades that Pioneer and Bosun USA purchased through 'unique product codes' assigned to each affiliate; (2) identifying the country of origin by matching those

3

codes to unit purchase prices; and (3) applying a first-in, first-out ('FIFO') methodology to assign a country of origin to each sale.

*Remand Order* (citing Questionnaire Response at C-1-C-3) at 5. Commerce issued two supplemental questionnaires to Bosun to elicit more information from Bosun regarding its sales identification methodology before verifying the methodology. Final IDM at 26.

At verification, Commerce found that Bosun kept merchandise in containers indicating country of origin. Verification Report at 4. Commerce also discovered several errors in Bosun's reporting. Of the 16 sales traces reviewed by Commerce, three contained reporting errors related to physical characteristics of the merchandise. *Id*. at 2, 7-8. Additionally, for one of the on-site sales traces, Commerce found that Bosun reported an incorrect quantity of sales from China and attributed this error to Bosun's FIFO methodology. *Id*. at 10-11. Bosun was unable to explain this discrepancy. *Id*.

In the *Final Results*, Commerce found that "the necessary requirements for {Commerce} to apply AFA have not been met pursuant to sections 776(a)(1) and (2) and (b) of the Act." Final IDM at 26. Although Commerce did not find Bosun's methodology to be inaccurate, it stated that for the purpose of future reviews Bosun "need{s} to maintain in {its} inventory and sales record system the clearly identifiable country of origin information for the merchandise that they sell to unaffiliated U.S. customers." *Id*. at 27. Commerce found that Bosun's alternative sales identification methodology satisfied the statutory requirements of 19 U.S.C. § 1677m(e). *Id*. Commerce further found that the error at verification caused by Bosun's FIFO methodology was a "minor error" and "limited to this sales trace only." *Id*.

## II.   The Court's First Remand Order

On appeal to this Court, DSMC challenged Commerce's decision not to apply AFA to Bosun due to its country-of-origin recordkeeping. *See* DSMC Mot. Judg. Admin. Record, at 12-

4

20, Dec. 4, 2017, ECF No. 27.  In the alternative, DSMC challenged Commerce's selection for the copper powder and copper iron "clab" factor of production of Thai import statistics as the "best available information" for Bosun.  *See id.* at 20-24.  DSMC also argued that the rate for separate rate respondents should be recalculated in the event that Commerce recalculated Bosun's dumping margin.  *See id.* at 24.  The United States defended Commerce's determination as being supported by substantial evidence and otherwise in accordance with law.  *See* Def. Resp. Mot. Judg. Adm. Record, Feb. 16, 2018, ECF No. 29.  Bosun, as defendant-intervenor, also defended Commerce's decision as supported by law and the record.  *See* Bosun Resp. Mot. Judg. Adm. Record, Feb. 16, 2018, ECF No. 30.

After briefing, this Court remanded for "further clarification and/or reconsideration" Commerce's determination that Bosun acted to the best of its ability in maintaining records of country of origin.  *See* Opinion and Order at 18, Oct. 23, 2018, ECF No. 36 (*DSMC I*).  The Court found that Commerce's application of the "best of its ability" standard was "at odds with appellate precedent," particularly that which requires respondents to "maintain full and complete records" of data.  *Id.* at 9-11.  The Court remanded Commerce's finding that Bosun was not inattentive, careless, or inadequate in keeping the country of origin records enough to warrant AFA, holding that Commerce failed to explain how its determination complied with the standard requiring Bosun to maintain full and complete records of relevant data.  *Id.* at 10-13.  The Court further found that Commerce did not adequately explain why Bosun "acted to the best of its ability" for the purposes of 19 U.S.C §1677m(e).  *Id.* at 14-16.

Regarding the errors discovered at verification, the Court found that Commerce "insufficiently explained" how the errors did not indicate a failure by Bosun to comply with the "best of its ability" standard.  *Id.* at 16-18.  The Court further found that Commerce insufficiently

explained its conclusion that the error discovered at verification regarding the FIFO methodology "was 'isolated' and did not affect other sales." *Id*. at 17. The Court explained that "the particularities of {the FIFO error} do not themselves suggest that the error was limited to this single sales trace" and that Commerce did not "identify anything unique about the reviewed samples that would suggest such errors were limited to those samples." *Id*. at 17. The Court also found that Commerce provided insufficient explanation for its conclusion that "errors in reporting physical characteristics were not widespread." *Id*.

The Court also remanded Commerce's determination regarding surrogate values for copper powder and copper iron clab for further consideration. *See id*. at 18-26. The Court further ordered that remand of the margin calculation for the separate rate respondents was necessary in light of the remand of Commerce's margin calculation for Bosun. *See id*. at 26.

## III.   Commerce's *First Remand Results*

In April 2019, Commerce filed remand results pursuant to the Court's remand order in *DSMC I*. *See* Final Results of Redetermination Pursuant to Court Remand, Apr. 17, 2019, ECF No. 43-1 (*First Remand Results*). In its *First Remand Results*, Commerce reexamined its determination pursuant to *DSMC I* and found that Bosun's country-of-origin reporting was unreliable, and that Bosun failed to cooperate to the best of its ability in its country-of-origin reporting, justifying the use of total AFA. *See First Remand Results* at 9-10. Commerce concluded that, by not maintaining records of the country of origin of its merchandise despite its ability to do so, Bosun failed to provide requested information in the form and manner requested by Commerce and significantly impeded the proceeding pursuant to 19 U.S.C. § 1677e(a)(2)(B)-(C). *See id*. at 9. Commerce further determined that Bosun's country-of-origin information was unreliable and could not be verified. *Id*. Accordingly, Commerce concluded that it was

6

appropriate to determine Bosun's rate entirely based on facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(2)(D). *Id.*

Commerce further determined that Bosun failed to cooperate regarding its country-of-origin recordkeeping despite having the ability to do so, and thus concluded that Bosun failed to cooperate to the best of its ability pursuant to 19 U.S.C. § 1677e(b). *See id.* at 10. Commerce thus applied facts otherwise available pursuant to 19 U.S.C. § 1677e(a) with an adverse inference pursuant to 19 U.S.C. § 1677e(b). *See id.* at 9-10, 26-27. Commerce applied a total AFA rate of 82.05 percent – the same rate it applied as an adverse facts available rate to Jiangsu Fengtai. *See id.* at 1, 26-27.

Because Commerce applied total AFA to Bosun, it determined that the second issue remanded by the Court, the surrogate value for copper powder and copper iron clab, was moot. *See id.* at 1-2. Commerce also applied the rate of 82.05 percent that was applied to Bosun and Jiangsu Fengtai to the other non-selected separate rate respondents. *See id.* at 2, 26-27.

**IV.   The Court's Opinion Sustaining The *First Remand Results***

Bosun challenged the *First Remand Results*, arguing that Commerce's application of total AFA to Bosun due to Bosun's country-of-origin recordkeeping was arbitrary and capricious because Commerce reached an opposite conclusion on remand with respect to whether Bosun's country-of-origin reporting warranted the use of AFA based on the same factual record. *See* Bosun Comments on Remand Redetermination at 4-5, June 3, 2019, ECF No. 47 (First Bosun Cmts.). Bosun further argued that Commerce was not justified in applying facts otherwise available pursuant to 19 U.S.C. § 1677e(a) because there was no necessary information missing from the record and Bosun's reporting was reliable overall. *See* First Bosun Cmts. at 5-17. Bosun further argued that Commerce's application of an adverse inference pursuant to 19 U.S.C.

7

§ 1677e(a) was improper on the grounds that Bosun complied with Commerce's requests to the best of its ability, and, in the alternative, that the AFA rate Commerce assigned to Bosun was excessive. *See id.* at 22-24.

After consideration of the parties' briefing relating to Bosun's challenge to the *First Remand Results*, the Court sustained the *First Remand Result*s. *Diamond Sawblades Mfrs. Coal. v. United States*, 415 F. Supp. 3d 1365 (Ct. Int'l Trade 2019) (*DSMC II*). The Court held that Commerce's finding that Bosun's country-of-origin reporting was unreliable was supported by substantial evidence. *Id.* at 1370. The Court further sustained Commerce's decision to apply an adverse inference in its application of total facts available for Bosun's dumping margin. *Id.* at 1372. Accordingly, the Court sustained Commerce's *First Remand Results*, in which Commerce applied total adverse facts available for Bosun's dumping margin. *Id.* at 1373.

## V.   The Federal Circuit's Decision In *Diamond Sawblades* And The Second Remand Order

Bosun appealed the case to the Federal Circuit, challenging the Court's holding in *DSMC I* that remanded Commerce's *Final Results* and the Court's holding in *DSMC II* that affirmed Commerce's *First Remand Results.*

The Federal Circuit rejected Bosun's challenge to *DSMC I*, explaining that this Court "expressed reasonable uncertainty about whether Commerce had properly considered the two 'best of its ability' standards regarding a person's supply of information{.}" *DSMC III*, 986 F.3d at 1361. The Federal Circuit further stated that this Court "reasonably sought additional explanation from Commerce about the ramifications of the errors Commerce identified in verifying Bosun's submissions." *Id.* Accordingly, the Federal Circuit concluded that this "Court's *DSMC I* remand to Commerce for further explanation was not an abuse of discretion." *Id.*

The Federal Circuit agreed in part with Bosun's challenge to *DSMC II*. First, the Federal Circuit examined the bases Commerce relied upon from 19 U.S.C. § 1677e(a) to apply the facts otherwise available. Although the Federal Circuit found that Commerce's reliance on 19 U.S.C. § 1677e(a)(2)(C) and § 1677e(a)(2)(B) was unsupported by the record, the Federal Circuit found that substantial evidence supports Commerce's findings that "'necessary information is not available on the record,' 19 U.S.C. § 1677e(a)(1), and, referring to information requested by Commerce, that Bosun 'provided such information but the information cannot be verified,' *id*. § 1677e(a)(2)(D)." *DSMC III*, 986 F.3d at 1363-64. Nevertheless, the Federal Circuit concluded that "Commerce has not satisfactorily explained why substantial evidence supports its determination of unreliability of all of Bosun's origin information." *Id*. at 1366. The Federal Circuit held that Commerce had not demonstrated "that there is a supported basis for finding the Bosun-supplied information unreliable outside the category of sales for which origin was identified using only the FIFO-inference step (rather than the two earlier steps)." *Id*. at 1367. Accordingly, the Federal Circuit stated that "a remand is advisable for the parties to address this focused issue . . . ." *Id*. Following the issuance of the mandate from the Federal Circuit, this Court remanded the case to Commerce for further proceedings in conformity with *DSMC III*. Second Remand Order.

## VI.    Commerce's *Second Remand Results* And Bosun's Comments

In its *Second Remand Results*, Commerce recalculated Bosun's dumping margin applying adverse facts available to only the sales which Bosun identified using the FIFO methodology. *Second Remand Results* at 2. Specifically, Commerce further considered the record evidence in light of *DSMC III* and found "no reliability concerns regarding Bosun's country-of-origin information for sales identified using either of the first two steps in the identification

methodology described above." *Id.* at 4. Accordingly, for sales identified without using the FIFO methodology, Commerce relied on Bosun's reported information and calculated a dumping margin based on that information. *Id.*

With respect to the sales identified using the FIFO methodology, however, Commerce continued to find it appropriate to resort to the facts otherwise available to "replace the missing or not reliably reported necessary information . . . for those sales, pursuant to {19 U.S.C. § 1677e(a)(1)} and (a)(2)(D){.}" *Id.* at 4-5. Furthermore, Commerce continued to find that an adverse inference was warranted when selecting from among the facts otherwise available because "Bosun failed to maintain full and complete records regarding country of origin, despite its apparent ability to do so, and despite its familiarity with Commerce proceedings and awareness of the need for distinguishing the country of origin of its merchandise for export." *Id.* at 5.

To apply adverse facts available to the FIFO-identified sales, Commerce explained that it identified those sales by sequence number and applied the adverse facts available rate of 82.05 percent to them. *Id.* at 6. Additionally, Commerce explained that, "{b}ecause not all of Bosun's FIFO-identified sales were reported in its U.S. sales database (*i.e.*, Bosun determined that they were Thai-origin product using its FIFO methodology), {Commerce} also applied the {adverse facts available} rate for the FIFO-identified sales in the U.S. sales database as a per-unit amount and applied that per-unit amount to the quantity of FIFO-identified sales which Bosun did not report in its U.S. sales database{.}" *Id.*

Commerce also addressed, in the *Second Remand Results*, DSMC's argument that Commerce's selected Thai surrogate value for copper powder and copper iron clab is aberrational and that Commerce should instead use a surrogate value from South Africa. *Id.* at 7-

11. Commerce continued to find that DSMC has not established that the Thai value is aberrational and therefore continued to use the Thai value for the *Second Remand Results. Id.* at 10-11.

Applying these calculations, Commerce determined a dumping margin for Bosun of 15.91 percent.[2] *Id.* at 23. Commerce applied this calculated margin for Bosun to the non-selected separate rate companies.

In its comments on Commerce's *Second Remand Results*, Bosun argues that, because Commerces's verification report includes intra-company sales that should be removed from Commerce's calculations.[3] Bosun Cmts. at 5. Bosun argues that there is no basis to include such sales as Bosun's U.S. sales or apply any adverse inference to them. *Id.* Bosun further argues that Commerce should have applied facts available – *without* an adverse inference – to Bosun's FIFO-identified sales because "Bosun acted to the best of its ability to find the most reliable and neutral method to determine country of origin." *Id.* at 10. Finally, Bosun argues that, even if an adverse inference is warranted in connection with the FIFO-identified sales, Commerce should have limited the application of adverse facts available to only sales information that was missing information, and that is not missing for the Chinese-origin FIFO-identified sales. Bosun Cmts. at 12-15.

---

[2] Although Commerce states on page 7 of the *Second Remand Results* that its methodology resulted in a 29.31 percent margin for Bosun, this was prior to Commerce's correction of an error identified by Bosun in Commerce's draft remand results. The margins listed for Bosun and the non-examined separate rate companies on page 23 reflect the correct remand margins after correcting for the error.

[3] DSMC did not file comments with this Court in opposition to the *Second Remand Results*.

**ARGUMENT**

## I.  **Standard Of Review**

This Court sustains Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i);  *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1373 (Ct. Int'l Trade 2010).  This standard applies equally to remand redeterminations.  *See, e.g.*, *Tianjin Magnesium Int'l Co.. v. United States*, 836 F. Supp. 2d 1377, 1380 (Ct. Int'l Trade 2012) (applying the standard of review to Commerce's remand redetermination).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II.  **Relevant Legal Framework For Application Of Adverse Facts Available**

19 U.S.C. § 1677e(a) governs Commerce's use of facts available to make determinations. Pursuant to 19 U.S.C. § 1677e(a)(1), Commerce shall use facts available where "necessary information is not available on the record."  Pursuant to 19 U.S.C. § 1677e(a)(2), Commerce shall use facts otherwise available if an interested party:

> withholds information that has been requested by the administering authority . . . , fails to provide such information by the deadlines for submission of the information or in the form and manner requested . . . , significantly impedes a proceeding under this subtitle, or provides such information but the information cannot be verified . . . .

19 U.S.C. § 1677e(a)(2).

19 U.S.C. § 1677e(b) governs Commerce's ability to apply adverse inferences when selecting from the facts available.  Specifically, 19 U.S.C. § 1677e(b) states:

> If the administering authority . . . finds that an interested party has
> failed to cooperate by not acting to the best of its ability to comply
> with a request for information . . . , the administering authority . . .
> may use an inference that is adverse to the interests of that party in
> selecting from among the facts otherwise available . . . .

19 U.S.C. § 1677e(b).

To draw an adverse inference under 19 U.S.C. § 1677e(b), Commerce need only make "an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations," and a subjective showing that the failure to fully respond is the result of the respondent's lack of cooperation in either "(a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003); *see also Peer Bearing Co. v. United States*, 766 F.3d 1396, 1400 (Fed. Cir. 2014) ("To comply with 'the best of its ability' provision, an importer must maintain access to information so long as that information is the type that a reasonable and responsible importer would have known was required to be maintained.").

If Commerce finds the application of an adverse inference to be appropriate, 19 U.S.C § 1677e(d)(1)(B) states that Commerce may "use any dumping margin from any segment of the proceeding under the applicable antidumping order." 19 U.S.C § 1677e(d)(1)(B). Further, under 19 U.S.C. § 1677e(c)(2), Commerce is not required to corroborate dumping margins applied in a separate segment of the same proceeding. Pursuant to 19 U.S.C. § 1677e(d)(2), Commerce has the discretion to apply the highest rate from any previous segment of the proceeding, based on Commerce's evaluation of the situation that resulted in the use of an adverse inference. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA)

further explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  H.R. Rep. 103-316, at 870 (1994).[4]

### III.    Commerce's Application Of Adverse Facts Available To Bosun's FIFO-Identified Sales Complies With *DSMC III* And Is Supported By Substantial Evidence And In Accordance with Law

Commerce's application of adverse facts available to the subset of Bosun's sales for which Bosun determined the country of origin using its FIFO methodology is supported by substantial evidence because Commerce reasonably determined that: (1) Bosun's FIFO methodology is unreliable and could not be verified, justifying the application of facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) and (a)(2)(D); and (2) Bosun failed to act to the best of its ability by not maintaining country-of-origin information, which is the reason Bosun needed to resort to the unreliable FIFO methodology in the first instance.  Commerce's *Second Remand Results* are consistent with *DSMC III* because Commerce did not disregard the country-of-origin information determined from the first two steps of Bosun's identification methodology. Instead, Commerce limited its application of adverse facts available to the information from Bosun's FIFO methodology that Commerce found to be unreliable.  Bosun's arguments to the contrary are unavailing.

---

[4] *See* 19 U.S.C. § 3512(d) ("{The SAA} is an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the Tariff Act of 1930, as amended,} in any judicial proceeding in which a question arises concerning such interpretation or application.").

**A.  Commerce Reasonably Applied Adverse Facts Available To Bosun's FIFO-Identified Sales Because Commerce Reasonably Found That Bosun's FIFO Methodology Was Unreliable**

Commerce reasonably continued to find that, for sales identified using the FIFO methodology, and consistent with *DSMC III*, "the evidence supports a finding that the information submitted could not be verified and that, as a result, origin information about those sales was missing{.}" *Second Remand Results* at 4-5 (quoting *DSMC III*, 986 F.3d at 1364). Because Commerce, upon re-examination, determined to use the origin information for the non-FIFO sales, Commerce also reconsidered how 19 U.S.C. § 1677e(b) applies to the matter, consistent with the Federal Circuit's direction. *Second Remand Results* at 5; *DSMC III*, 986 F.3d at 1367.

Commerce explained that it continued to find an adverse inference is warranted because "Bosun failed to maintain full and complete records regarding country of origin, despite its apparent ability to do so, and despite its familiarity with Commerce proceedings and awareness of the need for distinguishing the country of origin of its merchandise for export." *Second Remand Results* at 5. Commerce explained that, because of this failure, "Bosun was unable to reliably identify the country of origin for the FIFO-identified sales." *Id*. Accordingly, Commerce reasonably reconsidered and explained its basis for applying adverse facts available to only Bosun's FIFO-identified sales, consistent with *DSMC III*.

**B.  Bosun's Arguments To The Contrary Are Unavailing**

Bosun challenges the *Second Remand Results* in three respects. First, Bosun argues that the Court should order Commerce to eliminate intracompany sales from its calculations. Bosun Cmts. at 5-8. Second, Bosun argues that Commerce should have applied facts available without an adverse inference, rather than adverse facts available, to Bosun's FIFO-identified sales. *Id*. at

6-12. Third, Bosun asserts that, even if the Court upholds Commerce's application of adverse facts available, the application must be limited to information that is missing, *i.e.*, the country of origin of the FIFO-identified sawblades. *Id.* at 12-15. Bosun's arguments lack merit.

### 1. Commerce Was Not Required To Exclude Intracompany Sales Because Commerce Reasonably Found That Bosun's FIFO Methodology Was Unreliable As A Whole

Commerce addressed Bosun's arguments regarding intracompany sales in the *Second Remand Results*. Commerce explained that, consistent with the opinions of the Federal Circuit and this Court, Commerce continued to find it appropriate to apply adverse facts available with respect to all sales of sawblades identified using the unreliable FIFO methodology. *Second Remand Results* at 14. Commerce explained that "the verification report, where the FIFO methodology was examined and the reliability issues identified, makes no mention of intracompany sales as being part of Bosun's FIFO methodology." *Id.* at 15. Commerce further explained that the first time in this case that Bosun indicated that it used the FIFO methodology on intracompany sales was in the context of the remand proceeding, and therefore Commerce "was unable to verify this information or otherwise analyze these claims." *Id.* at 15.

Crucially, Commerce emphasized that the Federal Circuit remanded the case for Commerce to consider "whether 'there is a supported basis for finding the Bosun-supplied information unreliable *outside the category of sales for which origin was identified using the FIFO-inference step (rather than the two earlier steps)*.'" *Id.* at 15 (quoting *DSMC III*, 986 F.3d at 1367) (emphasis added in *Second Remand Results*). Therefore, Commerce found it appropriate to continue applying adverse facts available to all of Bosun's sales for which the country of origin was identified using the FIFO methodology.

16

Bosun argues that the nature of Bosun's transactions as intracompany sales is a fact on the record in Bosun's latest supplemental response that legally cannot be ignored and that ignoring the fact is contrary to Commerce's mandate to calculate accurate margins. Bosun Cmts. at 7. Commerce explained, however, that, because of the unreliability of the FIFO methodology, Commerce determined to apply adverse facts available to all the FIFO-identified sales, which Commerce explained is consistent with *DSMC III*. *Second Remand Results* at 14. Although Commerce requested additional information from Bosun in the remand proceeding, Commerce did so for the purpose of determining all of the FIFO-identified sales for which it would apply adverse facts available—not for the purpose or reopening or reexamining the FIFO methodology or further examining the sales to which it was applied. *See id.* Bosun's response on remand that some of the sales were intracompany sales came after verification, which did not give Commerce the opportunity to verify or analyze Bosun's claims. Therefore, Commerce reasonably continued to apply an adverse facts available rate to all the reported FIFO-identified sales. *Id.* at 15.

### 2.   Commerce Was Not Required To Apply Neutral Facts Available Because Commerce Reasonably Found That Bosun Failed To Cooperate To The Best Of Its Ability

Bosun argues that Commerce should have applied neutral facts available to Bosun's FIFO-identified sales because Bosun cooperated to the best of its ability throughout the administrative review, was transparent about the country-of-origin issues, and proposed a reasonable approach that Commerce accepted until reconsidering in the context of the appeals. Bosun Cmts. at 8. Bosun argues, based on its reading of *DSMC III*, that when necessary information is missing or information is unverifiable it does not imply a lack of cooperation with Commerce that is evident on its face. *Id.* at 9.

17

Bosun's argument is without merit.  Commerce did not find that the missing or unverifiable information itself implied a lack of cooperation, as Bosun suggests.  Rather, Commerce separately analyzed Bosun's conduct and found that Bosun's failure to maintain full and complete records regarding country of origin constituted a failure to cooperate to the best of its ability within the meaning of 19 U.S.C. § 1677e(b).  *Second Remand Results* at 5.

Notably, this Court explained that finding that Bosun met the "best of its ability" standard "would appear to be at odds with appellate precedent on the meaning of the 'best of its ability' standard and the facts on the record at bar{.}" *DSMC I* at 9.  Specifically, this Court cited Federal Circuit precedent establishing that the "best of its ability" standard "'requires the respondent to do the maximum it is able to do,' inclusive of 'maintaining full and complete records' of relevant data." *Id.* at 10 (citing *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1400 (Fed. Cir. 2014) (*Peer Bearing*); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (*Nippon Steel*)).  Moreover, as Commerce explained, the Federal Circuit stated in *DSMC III* that "{n}either Commerce nor the Trade Court misinterpreted our holdings in *Nippon Steel* or *Peer Bearing* regarding the 'best of its ability' standard of § 1677e(b)." *DSMC III*, 986 F.3d at 1367; *Second Remand Results* at 17.

Bosun asserts that the "best of its ability" standard does not require perfection and is satisfied when a respondent does "the maximum it is able to do." Bosun Cmts. at 9 (citing *Nippon Steel*, 337 F.3d at 1382).  Bosun fails to recognize, however, that doing the "maximum it is able to do" includes "tak{ing} reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce." *Nippon Steel*, 337 F.3d at 1382.  Accordingly, Bosun's argument that its sales documents do not record country of origin because "Bosun's U.S. customers do not specify or

care whether they are buying a Chinese- or Thai- origin blade" also fails. *See* Bosun Cmts. at 9. The standard does not concern what information might interest Bosun's customers, but rather the information that Bosun should anticipate being called upon to produce in an antidumping proceeding.

Bosun argues that Commerce's characterization of Bosun as an experienced mandatory respondent overlooks Bosun's unique circumstances, *i.e.*, that Bosun had shifted its main manufacturing operations to Thailand and dropped out of the top tier of Chinese exporters of subject merchandise. Bosun Cmts. at 10. This Court has previously rejected similar arguments from Bosun. As this Court explained, "Bosun cannot rely on a belief that it would not be selected for individual examination to justify its failure to maintain records." *DSMC II*, 415 F. Supp. 3d at 1372-73 (citing *Nippon Steel*, 337 F.3d at 1383). Although the Court's opinion was remanded, in part, by *DSMC III*, as explained above *DSMC III* stated that neither Commerce nor this Court misinterpreted the holdings of *Nippon Steel* or *Peer Bearing*. *DSMC III*, 986 F.3d at 1367.

Bosun asserts that it acted to the best of its ability to find the most reliable and neutral method to determine country of origin. Bosun Cmts. at 10. Whether the FIFO methodology could possibly be manipulated to advantage Bosun is not the issue. The issue is that Commerce determined, based on the errors in the methodology discovered at verification, that the FIFO methodology did not reliably identify the correct country of origin. Commerce's finding that Bosun's FIFO methodology was unreliable thus justified the application of adverse facts available because the "statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Nippon Steel*, 337 F.3d at 1383.

19

Bosun next argues that the assessment of whether a respondent complied to the best of its ability should take into account the respondent's efforts throughout the process, because otherwise respondents who are aware of a recordkeeping issue would have no incentive to cooperate. Bosun Cmts. at 11-12. Bosun's argument fails because it ignores the role of the adverse facts available statute in incentivizing the maintenance of full and complete records. The Federal Circuit recognized this role, explaining that the "best of its ability" standard "requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: {} take reasonable steps to keep and maintain full and complete records . . . ." *Nippon Steel*, 337 F.3d at 1382. Even if a respondent is aware of a recordkeeping issue at the beginning of a review, the respondent would still have the incentive to cooperate fully during the review due to the possibility of a broader adverse inference in other aspects of the review as a result of the failure to cooperate. Therefore, even though Bosun attempted to cooperate after Commerce initiated the review, Commerce appropriately applied adverse facts available to the FIFO-identified sales based on Bosun's failure to maintain country of origin records for those sales beforehand.

### 3. Commerce Was Not Required To Accept Sales Price Information For Sales With Missing Country-Of-Origin Information Because Commerce Reasonably Found That Those Sales May Not Be Subject Merchandise

Finally, Bosun argues that even if the Court finds that adverse facts available is warranted, Commerce's application of adverse facts available must be limited to information that is missing, *i.e.*, the country of origin of the FIFO-identified sawblades. Bosun Cmts. at 12. Bosun asserts that because the sales price information for transactions previously identified as Chinese-origin sales under the FIFO method is on the record, Commerce cannot ignore such information and must use it in determining a dumping margin. Bosun Cmts. at 13-15. Bosun's

argument is without merit because, as Commerce explained, Bosun's approach would not necessarily result in a less favorable outcome than if Bosun had cooperated fully by maintaining proper country of origin records. *Second Remand Results* at 22; *see* SAA at 870 (explaining that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully").

Bosun argues that Commerce cannot ignore the uncontested sales price information provided by Bosun's U.S. sales database for the reported FIFO sales. Bosun Cmts. at 15. Bosun fails to recognize the impact of the fact that that, although the U.S. price information for these sales is on the record, their reported country of origin is not reliable. Although Bosun asserts that Commerce cannot ignore the price information on the record, because of the unreliable country of origin information and the fact that these sales are not necessarily of subject merchandise, the record does not establish that this price information should be considered in Bosun's margin calculation. *See Second Remand Results* at 21.

As Commerce explained, to include the FIFO-identified sales as Chinese sales when it is possible that they are Thai sales "could involve calculating margins for sales of non-subject merchandise (*i.e.*, Thai sawblades) and including them in the weighted average margin applicable to subject merchandise (*i.e.*, Chinese sawblades)." *Second Remand Results* at 21-22. Depending on the calculations, this would not necessarily result in a less favorable outcome for Bosun than if Bosun had cooperated fully by maintaining accurate country of origin information. Given these circumstances, Commerce's approach is a reasonable method of determining an overall "reasonably accurate estimate of the respondent's actual rate, *albeit with some built-in increase intended as a deterrent to non-compliance*." *DSMC III*, 986 F.3d at 1367 (quoting *F.lli*

*de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

Bosun argues that the circumstances here are highly similar to *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018). Bosun's reliance on *Dillinger France* is misplaced. In *Dillinger France*, the missing information was the identity of the manufacturer for certain home market sales. *Dillinger France*, 350 F. Supp. 3d at 1364. Here, the unreliable information is the country of origin for U.S. sales, which determines whether the sales are sales of subject merchandise or not. Moreover, on remand in *Dillinger France* Commerce determined that, "because of the small number of affected transactions whose prices are used as a basis for normal value and which are actually compared to U.S. sale prices, these home market transactions have no measurable impact on Dillinger France's estimated weighted-average dumping margin." *Dillinger France S.A. v. United States*, 393 F. Supp. 3d 1225, 1228 (quoting Commerce's remand results at 6-7).

Here, by contrast, there is no indication that the missing reliable country of origin information would have no measurable impact, as the information is critical to determining whether a sale is of subject merchandise or not. *See Second Remand Results* at 21. Therefore, Commerce explained that the issue could not be remedied by simply assuming all sales were of Chinese merchandise without also applying an adverse facts available rate to those sales. *Id*. Accordingly, Commerce's approach was reasonable and consistent with the aim of the adverse facts available statute.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's *Second Remand Results*.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director


/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

|  |  |
|---|---|
| Of Counsel: | /s John J. Todor |
| PAUL KEITH | JOHN J. TODOR |
| Attorney | Senior Trial Counsel |
| Office of the Chief Counsel | Commercial Litigation Branch |
| for Trade Enforcement & Compliance | U.S. Department of Justice |
| U.S. Department of Commerce | Civil Division |
|  | P.O. Box 480 |
|  | Ben Franklin Station |
|  | Washington, DC 20044 |
|  | Tel: (202) 616-2382 |
|  | Fax: (202) 514-8640 |
|  | Email: john.todor@usdoj.gov |
| September 13, 2021 | Attorneys for Defendant |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to paragraph 2(B)(2) of the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that these comments comply with the word limitations set forth in paragraph 2(B)(1) of the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that these comments contain 6,636 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word 2016) used to prepare this brief.

<u>/s/ John J. Todor</u>