NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

THE DIAMOND SAWBLADES
MANUFACTURERS' COALITION,

                  Plaintiff,

v.

UNITED STATES,

                  Defendant,

        and

BOSUN TOOLS CO., LTD.,

                  Defendant-Intervenor.

Before: Hon. Claire R. Kelly,
          Judge

Court No. 17-00167

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages 7, 8, 14

## <u>DIAMOND SAWBLADES MANUFACTURERS' COALITION'S RESPONSE TO BOSUN TOOLS' COMMENTS ON SECOND REMAND RESULTS</u>

Daniel B. Pickard, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Diamond Sawblades Manufacturers' Coalition*

Dated: September 13, 2021

Ct. No. 17-00167                                                   NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.    BACKGROUND .................................................................................................. 1

III.    ARGUMENT .................................................................................................. 6

        A.    Commerce Did Not Err in Refusing to Remove from its Calculations Transactions that Bosun Now Claims Are Intracompany Sales ............................ 7

        B.    Commerce Did Not Err in Refusing to Apply "Neutral" Facts Available to Bosun's Sales for Which Origin Was Identified Using the FIFO Step ............................................................................................ 9

        C.    Commerce Was Not Required to Employ Adverse Inferences in the Way that Bosun Argues ................................................................................ 12

IV.    CONCLUSION .................................................................................................. 16

Ct. No. 17-00167                                           NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AG der Dillinger Hüttenwerke v. United States*,
    399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) ..........................................................13

*Algoma Steel Corp. v United States*,
    865 F.2d 240 (Fed. Cir. 1989).......................................................................13

*Diamond Sawblades Mfrs.' Coal. v. United States*,
    986 F.3d 1351 (Fed. Cir. 2021)....................................................................3, 6, 10

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003).......................................................................11

**Administrative Materials**

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 82
    Fed. Reg. 26,912 (Dep't Commerce June 12, 2017)  .................................................3

Ct. No. 17-00167                                                      NON-CONFIDENTIAL VERSION

## I.     INTRODUCTION

On behalf of the Diamond Sawblades Manufacturers' Coalition ("DSMC"), we submit this

response to the August 12, 2021 comments filed by defendant-intervenor Bosun Tools Co., Ltd.

("Bosun") in opposition to the July 13, 2021 remand determination issued in this action by the

U.S. Department of Commerce ("Commerce"). *See* Def.-Int. Bosun Tools Co., Ltd. Comments on

Second Remand Redetermination (Aug. 12, 2021), ECF No. 77 ("Bosun's Comments"); Final

Remand Redetermination, *Diamond Sawblades Mfrs.' Coal. v. United States*, Ct. No. 17-00167,

Appeal No. 20-1478 (July 13, 2021), ECF No. 74 ("Second Remand Results").

## II.    BACKGROUND

These remand proceedings arise from litigation concerning Bosun's margin in the 2014-

2015 administrative review of the antidumping duty order on Chinese diamond sawblades. Second

Remand Results at 1. In reporting its U.S. sales for the review period, Bosun stated that it sold

both subject Chinese-origin diamond sawblades and sawblades of Thai origin. Letter from

deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Diamond Sawblades from the People's*

*Republic of China – Sections C & D Questionnaire Response* (July 1, 2016), C.R. 132-143,

P.R. 207-210 at C-1 – C-2 ("CDQR").[1] However, the company failed to maintain direct

information on the origin of the sawblades its sold. Therefore, for purposes of its sales reporting,

it constructed an after-the-fact methodology for backing out sawblade origin based on whether its

---

[1]     Throughout this brief, references to confidential and public record documents listed in the original administrative record indices filed with this Court on August 14, 2017 are designated with the rubric "C.R.," followed by the appropriate record number, or "P.R.," followed the appropriate number. Record documents listed in the administrative record indices filed in the wake of the second remand results on July 27, 2021 are designated by "2.C.R.," or "2.P.R.," followed by the appropriate record number.

U.S. selling affiliates purchased goods of a particular product code only from the company's Chinese production facilities, its Thai facilities or both. *Id.* at C-2 – C-3. Where the selling affiliate purchased from both the Chinese and Thai facilities, Bosun attempted to determine origin based on the price at which the affiliate purchased the sawblades. *Id.* Where Bosun could not back out the origin of a sawblade based on these methods, it used a "first-in-first-out" ("FIFO") method to assign origin to its sawblades. *Id.* at C-3.

At verification, Commerce confirmed that Bosun's U.S. sales affiliates maintained their inventory in boxes that identified the country of origin but that, when merchandise was removed from inventory and prepared for sale to unaffiliated customers, country of origin was not recorded. Memorandum from Thomas Schauer, Yang Jin Chun, and Andre Gziryan, Int'l Trade Compliance Analysts, AD/CVD Operations, Off. I, through Alex Villanueva, Dir., AD/CVD Operations, Training and Pro. Dev. Unit, and Minoo Hatten, Program Manager, AD/CVD Operations, Off. I, to The File, re: *Diamond Sawblades and Parts Thereof from the People's Republic of China: Verification of the U.S. Sales Response of Bosun Tools Co., Ltd.* (May 17, 2017) C.R. 365, P.R. 383 at 4 ("Verification Report"). The country of origin was not recorded because, according to Bosun, "the country of origin was not necessary information which needed to be recorded in its computer system for purposes of its business operation." *Id.* Commerce further found that Bosun could not fully replicate the results of the FIFO step of its methodology for the sales transactions reviewed at verification. *Id.* at 10-11.

In its case brief, DSMC argued that Commerce should use adverse inferences to determine Bosun's margin, because the company failed to maintain country of origin records and could not replicate the FIFO step at verification. *See, e.g.*, Letter from Wiley Rein LLP to Sec'y Commerce, re: *Diamond Sawblades and Parts Thereof from the People's Republic of China: Case Brief on*

*Results of Bosun's U.S. Sales Verification* (May 23, 2017), C.R. 366, P.R. 385 at 3, 12-19. Commerce did not apply adverse inferences, and ultimately calculated a margin of 6.19% for Bosun. *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 82 Fed. Reg. 26,912 (Dep't Commerce June 12, 2017) (final results of antidumping duty admin. rev; 2014-2015), P.R. 404 ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 389 at 25-30. This margin was also assigned to non-selected separate rate companies. Final Results, 82 Fed. Reg. at 26,913.

DSMC appealed Commerce's decision not to employ adverse inferences. *Diamond Sawblades Mfrs.' Coal. v. United States*, No. 17-00167, slip op. 18-146 at 2 (Ct. Int'l Trade Oct. 23, 2018), ECF No. 36 ("Slip Op. 18-146"). In an opinion dated October 23, 2018, this Court remanded Commerce's final results for further consideration. *See, e.g.*, Final Remand Redetermination, *Diamond Sawblades Mfrs.' Coal. v. United States*, Ct. No. 17-00167, Slip Op. 18-146 (Apr. 17, 2019), ECF No. 43 at 1 ("First Remand Results"). On remand, Commerce applied total adverse inferences to Bosun, after finding that information necessary to calculate an accurate antidumping margin was missing from the record due to Bosun's failure to maintain the origin information that had been in its possession. *Id.* at 9-12. Commerce revised the margin for Bosun and for non-selected separate rate companies accordingly. *Id.* at 26-27.

After this Court affirmed these remand results, Bosun appealed to the U.S. Court of Appeals for the Federal Circuit ("CAFC"). *Diamond Sawblades Mfrs.' Coal. v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) ("CAFC Decision"). The CAFC found that while the record supported resorting to the facts available with adverse inferences for those sales for which Bosun relied on the FIFO method to report origin, Commerce had not satisfactorily explained why it had found all of Bosun's origin reporting unreliable. *Id.* at 1367. Accordingly, the CAFC found that the case

should be remanded for further consideration of the application of adverse inferences to sales for which origin was identified based on affiliate or price.

On remand, Commerce found Bosun's country-of-origin reporting reliable where the origin was determined based on product code or purchase price. Draft Remand Redetermination, *Diamond Sawblades Mfrs.' Coal. v. United States*, Ct. No. 17-00167, Appeal No. 20-1478 (May 17, 2021), 2.P.R. 3 at 2, 5. However, Commerce found that an adverse inference remained warranted as to sales for which origin was determined through the FIFO step of its methodology. *Id.* The agency noted that the pre-remand record did not provide any means by which it could identify the particular sales for which Bosun determined origin using the FIFO step. *Id.* at 5-6. The agency accordingly issued Bosun a supplemental questionnaire on the issue, and then applied the adverse rate of 82.05% to all sales for which Bosun used the FIFO step to determine origin. *Id.* at 6-7.

In comments on the draft results, Bosun argued that Commerce made a ministerial error in its draft calculations. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Diamond Sawblades from the People's Republic of China – Comments on Second Remand Results* (June 1, 2021), 2.C.R. 8, 2.P.R. 7 at 5-8 ("Bosun's Draft Comments"). Bosun also argued that Commerce should remove from its calculations certain intracompany sales that Bosun originally reported as relating to non-subject Thai sawblades pursuant to the FIFO step of its methodology. *Id.* at 8-9. Bosun argued that Commerce should not apply adverse facts available with respect to any of its sales. *Id.* at 9-12. At most, Bosun argued, Commerce's adverse inference should be limited to finding that all sales for which origin was identified through the FIFO step were Chinese, and thus constituted subject merchandise. *Id.* at 13-15. Acknowledging that data on sales originally identified through the FIFO step as Thai were not on the record, Bosun argued that Commerce

4

should issue another supplemental questionnaire, and specifically seek data regarding sales that Bosun originally reported as non-subject pursuant to the FIFO step of its methodology. *Id.*

In its final results of redetermination, Commerce agreed with Bosun that its draft calculations reflected certain ministerial errors, and adjusted the calculations accordingly. Second Remand Results at 12. However, Commerce did not remove Bosun's claimed intracompany sales from its calculations. *Id.* at 13-15. Commerce explained that Bosun had never previously reported that sales for which origin was identified using the FIFO step included intracompany sales and, as such, this claim had not been verified or otherwise analyzed. *Id.* at 15-17.

Commerce also rejected Bosun's argument that only "neutral" facts available should be applied to sales for which origin was identified through the FIFO step. *Id.* at 15-18. Commerce noted that the CAFC had not invalidated the application of adverse inferences with respect to such sales. *Id.* at 17-18. Commerce also found that, contrary to Bosun's claims, it had the appropriate factual and legal predicate to apply adverse inferences with respect to sales identified through the FIFO step, due to Bosun's inadequate recordkeeping. *Id.* at 18.

Finally, Commerce did not adopt Bosun's suggestion that the agency should request supplemental data regarding sales that the company originally identified through the FIFO step as being Thai. *Id.* at 21-22. Commerce noted that reliable information regarding the origin of sales subjected to the FIFO step was missing from the record, and that it was missing due to Bosun's recordkeeping failures. *Id.* at 21. Commerce also found that Bosun's suggested method of proceeding would not necessarily result in any adverse inference being applied, and further stood to distort the agency's calculations in a manner ultimately favorable to Bosun. *Id.* at 21-22. Accordingly, Commerce continued to apply an adverse rate of 82.05% to Bosun's sales for which

origin had been determined using the FIFO step, resulting in an overall margin of 15.91%. *Id.* at 22-23.

## III.   ARGUMENT

This Court should affirm Commerce's remand results. Consistent with the CAFC's decision, Commerce is no longer applying an adverse inference to those sales for which Bosun was able to identify the country of origin based on the sales affiliate or price. *Id.* at 4-5; *see also* CAFC Decision, 986 F.3d. at 1367. Commerce's adverse inference is limited to those sales for which Bosun identified origin based on the FIFO step of its origin-identification methodology, consistent with the CAFC's finding that Bosun did not act to the best of its ability with respect to maintaining origin information for such sales. Second Remand Results at 17 (quoting CAFC Decision, 986 F.3d. at 1367). Commerce's remand results are accordingly fully consistent with the CAFC's findings, and should be affirmed.

Bosun nonetheless argues that Commerce's determination should be remanded for a third time. Bosun first argues that Commerce erred in refusing to remove from its calculations certain sales that Bosun claims constituted intracompany transactions. Bosun's Comments at 5-8. Next, Bosun argues that Commerce should have applied neutral facts available with respect to sales subject to the FIFO step of the company's origin identification methodology, because Bosun "cooperated to the best of its ability" and was otherwise responsive during the review. *Id.* at 8-12. Finally, Bosun argues that even if Commerce can reasonably apply an adverse inference, the agency should be required to utilize the company's reported U.S. pricing data for sales identified as Chinese through the FIFO method, and to utilize that same pricing data with respect to sales originally identified through the FIFO method as pertaining to non-subject, Thai goods. *Id.* at 12-15.

Bosun's arguments, as explained below, are not compelling. The Court should therefore affirm Commerce's remand results.

### A.   Commerce Did Not Err in Refusing to Remove from its Calculations Transactions that Bosun Now Claims Are Intracompany Sales

In its supplemental questionnaire on remand, Commerce requested that Bosun provide the U.S. sales database sequence numbers for the sales that were subject to the FIFO step of Bosun's origin-identification methodology. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Diamond Sawblades from the People's Republic of China – Remand Supplemental Questionnaire* (Apr. 19, 2021), 2.C.R. 2-4, 2.P.R. 2 at 1 ("Remand Questionnaire Response"). Bosun stated that it could not provide the sequence numbers for certain sales because they were originally identified as Thai, and thus not reported in its U.S. sales database. *Id.* at 1-2.

Bosun also stated that it was unable to provided sequence numbers for an additional group of sales subjected to the FIFO step, because they constituted intracompany transactions. *Id.* Bosun provided no supportive documentation for this assertion. *See generally id.* Nor did Bosun provide Commerce with the number of sawblades accounted for by alleged intracompany sales. *See id.* at Exhibits SQ-1 & SQ-2. Subsequently, in its comments on the draft results of remand, Bosun stated that intracompany transactions accounted for [      ] of the [      ] sawblades sold by Bosun's sales affiliate Bosun Tools Inc., for which origin was identified using the FIFO step. Bosun's Draft Comments at 8-9. Bosun provided no supportive documentation for this figure. *See id.*

Bosun now argues that Commerce should have removed the alleged intracompany sales from the margin calculations. Bosun's Comments at 5-8. Bosun implies that Commerce was aware from verification that the FIFO step affected intracompany transactions, noting that "Commerce {} verif{ied} the entire FIFO methodology in the original review and found no issues with the

7

**BUSINESS PROPRIETARY INFORMATION**
                         **HAS BEEN DELETED**

reliability of its methodology." *Id.* at 6. Simultaneously, Bosun faults Commerce for not further exploring the issue of intracompany transactions. *Id.* at 6-7. The company argues that Commerce could not legally ignore the fact of the intracompany sales, because (1) the record indicates that they are there, (2) their inclusion reduces the accuracy of the margin, and (3) their inclusion amounts to double-counting. *Id.* at 7-8.

These arguments are unavailing. As Commerce notes in its Second Remand Results, Commerce issued questionnaires to Bosun regarding its origin identification methodology during the original review proceedings. In these responses, Bosun did not indicate that intracompany sales were affected by the FIFO step. Second Remand Results at 15. Indeed, in its questionnaire responses, Bosun indicated that while its affiliates purchased goods from one another, its origin identification methodology was applied only to goods "for resale" and "resale transaction{s}." Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Diamond Sawblades from the People's Republic of China –Supplemental Questionnaire* Response (Sept. 7, 2016), C.R. 194-234, P.R. 258-272 at 2-3 ("1SQR"); CDQR at C-1 – C-3. This indicated that the company used the methodology, as one would naturally expect given the focus of the antidumping calculations on sales to unaffiliated third parties, to determine the origin of goods at the point at which they were sold to unaffiliated third parties. 1SQR at 2-3.

Consistently with this understanding, in explaining its origin methodology in its second supplemental questionnaire response, Bosun walked through the treatment of goods sold to [                                                  ]. *Compare id.* at Exhibits S1-19 – S1-21 *with* Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Diamond Sawblades from the People's Republic of China – Second Supplemental Questionnaire* Response (Nov. 10, 2016), C.R. 295-333, P.R. 332-333 at 2-3 ("2SQR"). At no point did Bosun indicate or explain that it had applied its methodology

to determine origin at the point of sale between affiliates, *i.e.*, with respect to intracompany transactions.

Nor does Commerce's verification report contain any indication that intracompany sales were affected by the FIFO step. Rather, like Bosun's questionnaire responses, the verification report indicates that the step affected only sales to unaffiliated third parties. Specifically, Commerce noted that "{u}sing the FIFO methodology, Bosun identified the country of origin based on when and where (*i.e.*, China or Thailand) the products of the same type and purchase price were purchased and when they were sold *to unaffiliated* U.S. customers." Verification Report at 10-11 (emphasis added).

Bosun's statement in its remand questionnaire response that the FIFO step was applied to intracompany transactions thus contradicts its earlier reporting and the explanations that the company provided at verification. Nor was Commerce able to "verify or otherwise analyze" the claim, which was presented for the first time after nearly five years of litigation, and without any supporting documentation. Second Remand Results at 15. Given that the record contained verified information indicating that the FIFO step was applied only with respect to sales to unaffiliated customers, and an unverified, belated statement to the contrary, Commerce reasonably treated all sales for which origin was determined through the FIFO step as sales to unaffiliated third parties.

**B.**      **Commerce Did Not Err in Refusing to Apply "Neutral" Facts Available to Bosun's Sales for Which Origin Was Identified Using the FIFO Step**

As this Court has explained, origin data is "among the most basic data necessary for the calculation of a margin." Slip Op. 18-146 at 11. As such, an "experienced respondent would reasonably foresee the need to maintain it." *Id.* Even in its original final results, in which Commerce did not employ adverse inferences, the agency noted that Bosun would need to maintain

this data in future reviews. *See, e.g.*, *id.* at 12. And while the CAFC remanded Commerce's application of adverse inferences with respect to sales for which Bosun was able to determine origin by cross-referencing which Bosun entity first sold the goods, or the price of those goods, the CAFC found that Commerce reasonably deemed unreliable Bosun's origin information for sales for which Bosun identified origin through the FIFO step. CAFC Decision, 986 F.3d. at 1365.

Bosun nonetheless argues that an adverse inference is not warranted with respect to sales subject to the FIFO step. Bosun's Comments at 8-12. Bosun argues that while it may have provided data that was ultimately unverifiable, it acted "to the best of its ability" to comply with Commerce's information requests within the meaning of 19 U.S.C. § 1677e(b). *Id.* at 8-9. Bosun argues that its "U.S. customers do not specify or care whether they are buying a Chinese- or Thai-origin blade," implying that it was reasonable for Bosun not to keep records of the origin of its sawblades, *id.* at 9-10, even though failing to do so increased the risk that it would be unable to reliably provide "the most basic data necessary for the calculation of a margin." Slip Op. 18-146 at 11. Bosun faults Commerce for "completely overlook{ing} Bosun's unique circumstances," specifically, the fact that Bosun did not expect to be selected as a mandatory respondent in the review. Bosun's Comments at 10.  Bosun argues that despite these unique circumstances, it was able to use its books and records to identify the origin for most of its U.S. sales, and utilized a "logical" and "neutral" assumption (*i.e.*, the FIFO step) to determine origin for the remainder of its sales. *Id.* at 10-11. Bosun also argues that adverse inferences are meant to incentivize cooperation, rather than punish respondents. *Id.* at 11. Finally, Bosun argues that the question of whether it acted to the best of its ability should be answered in the context of its actions throughout the review, rather than being "disproportionately" focused on whether it failed, pre-review, to keep records of required data. *Id.* at 11-12.

Bosun's argument that Commerce was required to apply only neutral facts available here is without merit. Bosun was unable to provide reliable origin data for a portion of its sales due to its failure to maintain records of such information. *See, e.g.*, Second Remand Results at 18. An adverse inference is appropriate where a respondent has failed to maintain information that a reasonable respondent would have anticipated was needed for the calculation of a dumping margin. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (finding that the "best of its ability" standard does not condone "inadequate recordkeeping.")

Here, Bosun was an experienced respondent, individually reviewed in the original investigation as well as the third and fourth annual reviews. First Remand Results at 10. It also requested a review of its sales in this proceeding specifically; as such, it should have anticipated that Commerce would require it to provide the information necessary to calculate a dumping margin. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Diamond Sawblades from the People's Republic of China – Request for Administrative Review, 2014-2015* (Nov. 30, 2015), P.R. 6. Nor is there any doubt that origin data constitutes information necessary for a margin calculation. Slip Op. 18-146 at 11.

By failing to maintain information that would allow it to verifiably determine the origin for certain of its U.S. sales, Bosun did not comply with the "best of its ability" standard as to those sales. As such, Commerce reasonably found that it had the legal and factual predicate required to apply adverse inferences with respect to those sales. Second Remand Results at 18. Commerce accordingly was not required to employ neutral facts available with respect to sales for which origin was determined using the FIFO step, and this Court should affirm the agency's decision to resort to adverse inferences regarding these sales.

NON-CONFIDENTIAL VERSION

**C.      Commerce Was Not Required to Employ Adverse Inferences in the Way that Bosun Argues**

Having appropriately determined to apply an adverse inference to sales for which Bosun determined origin using the FIFO step, Commerce identified the relevant sales included in Bosun's U.S. sales database. Second Remand Results at 6. Commerce applied an adverse rate of 82.05% for these sales. *Id.* It then derived a per-unit adverse amount and applied it to sales that were not reported in the U.S. sales database, but which were among the sales for which origin was determined using the FIFO step. *Id.* Commerce then combined the adverse margin for sales subject to the FIFO step that were reported in the U.S. sales database with the margin for FIFO-step sales that were not reported in the database, and the calculated margins for sales not subject to the FIFO step. *Id.* at 7.

Bosun argues that Commerce acted unreasonably in applying the adverse rate of 82.05% to its FIFO-identified sales. Bosun's Comments at 12-15. Bosun claims that while reliable origin information is missing from the record with respect to its sales subjected to the FIFO step, reliable U.S. price data are not. *See id.* Noting that it applied the FIFO step only with respect to sales of goods that had identical purchase costs regardless of origin, Bosun argues that Commerce should have applied the U.S. resale prices that it reported for Chinese-identified FIFO-step sales to all of its FIFO-step sales. *Id.* Pointing to *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1348 (Ct. Int'l Trade 2018), Bosun argues that this "unchallenged record information" regarding prices cannot be ignored. *Id.* at 14-15 (quoting *Dillinger France*, 350 F. Supp. 3d at 1364). As such, Bosun argues that its originally-submitted sales prices to unaffiliated U.S. customers should be applied to all sales subject to the FIFO step, rather than the 82.05% adverse rate. *Id.*

Bosun's argument again falls wide of the mark. As an initial matter, while it relies on
*Dillinger France*, the decision in that case is not binding on this Court. *Algoma Steel Corp. v
United States*, 865 F.2d 240 (Fed. Cir. 1989) (finding that the judges of the U.S. Court of
International Trade are not bound by decisions issued by other judges of the Court). Indeed, this
Court rejected the logic of *Dillinger France* in *AG der Dillinger Hüttenwerke v. United States*, 399
F. Supp. 3d 1247, 1256 (Ct. Int'l Trade 2019). *Dillinger France* also involved a unique factual
situation, in that the number of sales to which adverse inferences were applied – whether in the
original manner rejected by the *Dillinger France* Court or the manner later affirmed by that Court –
was so small as not to alter the dumping margin. *See Dillinger Hüttenwerke*, 399 F. Supp. 3d at
1256-57 (describing results of remand proceedings in *Dillinger France*). As a result, the manner
in which adverse inferences were applied in that case was effectively moot. DSMC respectfully
submits that this fact further undermines *Dillinger France*'s relevance here.

Crucially, while Bosun argues that the record contains the information necessary for
Commerce to calculate accurate margins for the all of sales subjected to the FIFO step (except
origin), this is not the case. The record indicates how many sawblades per product model were
originally identified as Chinese using this step. *Compare* Remand Questionnaire Response at
Exhibits SQ-1 & SQ-2 (providing data to enable Commerce to determine which sales reported in
the U.S. sales database were identified as Chinese through the FIFO step) *with* 2SQR at Exhibit
S2-4 (revised U.S. sales database, providing quantities of Chinese-identified sales by product
model). It also indicates how many sawblades were subject to the FIFO step overall. Verification
Report at 11. But it does not contain information regarding the number of sawblades per product
model that were originally identified as Thai using the FIFO step – just a listing of invoices and

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

product models sold on those invoices, without product model quantities. Remand Questionnaire Response at Exhibit SQ-2.

As Commerce explains, the absence of this data is a gap in itself. *See* Second Remand Results at 21-22. Further, filling that gap in the manner that Bosun desires necessarily means assuming, in the absence of data, that the Thai-identified sawblades followed a particular product mix. *Id.* at 22. The problem for Bosun's argument, accordingly, is that Commerce simply cannot treat all the sawblades as Chinese (and apply the U.S. resale pricing data for China-identified FIFO-step sales to all of the FIFO-step sawblades) without knowing how many sales of sawblades of each FIFO-step product model there are in total. But like the accurate origin identification, overall model-specific quantity data for the FIFO-identified sales is missing from the record, due to Bosun's inability to reliably identify the origin of sawblades subjected to the FIFO step.

Any attempt by Commerce to calculate the margin in the way that Bosun argues would necessarily involve not only filling this gap through assumptions as to overall quantities by product model, but filling the gap in a way that is not clearly adverse – and potentially even favorable – to Bosun. But as Commerce indicated, the point of an adverse inference is to ensure that a respondent does not achieve a more favorable result by not complying with that standard than it would through compliance, incentivizing that respondent to meet the "best of its ability" standard in the future. *See id.* at 22.

Too, with respect to the Thai-identified blades subjected to the FIFO step, there is [

]. Remand Questionnaire Response at Exhibit SQ-2; *see also* Bosun's Draft Comments at 15 (admitting that the record lacked U.S. price data for sales originally identified as Thai through the FIFO step). In the absence of such data, Bosun would have Commerce assume that all of its Thai-identified blades of a

particular product model (however many that is) were sold to unaffiliated U.S. customers at the same prices as Chinese-identified blades of the same product model. But while these Thai-identified blades were subjected to the FIFO step because Bosun's affiliates bought them for a single purchase price regardless of origin, the price at which a good is purchased does not dictate the price at which it is resold. Assigning the resale price for the Chinese-identified blades to the Thai-identified blades again would require Commerce not only to fill a gap in the record data that exists solely because of Bosun's inability to reliably identify origin through the FIFO step, but to fill it in a way that is not clearly adverse – and potentially even favorable – to Bosun. *See* Second Remand Results at 21-22.

In sum, Bosun does not persuade that Commerce was required to limit its adverse inference in the manner that Bosun proposes – *i.e.*, by assuming that all FIFO-identified sales were Chinese, but then filling in the data gaps resulting from Bosun's failure to provide reliable origin data for FIFO-identified sales in a neutral or even favorable manner. Rather, Commerce acted reasonably in applying a uniform, adverse rate to the affected sales. This Court should therefore affirm the manner in which Commerce applied its adverse inference.

NON-CONFIDENTIAL VERSION

## IV.   CONCLUSION

For the reasons discussed above, the Court should affirm Commerce's remand results.

Respectfully submitted,

/s/Daniel B. Pickard
Daniel B. Pickard, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Diamond Sawblades Manufacturers' Coalition*

Dated: Sept. 13, 2021

# CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that these response comments comply with the word limitation requirement. The word count for Diamond Sawblades Manufacturers' Coalition's Response to Bosun Tools' Comments on Second Remand Results, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,639 words.

*/s/ Daniel B. Pickard*
(Signature of Attorney)

Daniel B. Pickard
(Name of Attorney)

Diamond Sawblades Manufacturers' Coalition
(Representative Of)

September 13, 2021
(Date)